**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOAN HARVEY, | |
| **Plaintiff,** | |
| -against- | **Civil Action No. 1:23-cv-02662-HG** |
| DELTA AIR LINES, INC. | |
| **Defendant.** | |

### DEFENDANT DELTA AIR LINES, INC.'S PROPOSED
### <u>STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1</u>

Defendant Delta Air Lines, Inc. ("Delta" or "Defendant"), by and through its attorneys, Morgan, Lewis & Bockius LLP, submit this Local Rule 56.1 Proposed Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the Eastern District of New York, and the Individual Practices of this Court.[1]

---

[1] Citations to the record will be as follows: (1) Plaintiff's Complaint, filed on April 10, 2023 (Dkt. No. 1) ("Compl."); (2) Excerpts from the transcript of the deposition of Plaintiff, taken on October 25, 2023 ("Pl. Tr."); (3) Excerpts from the transcript of the deposition of Peter Corrao, taken on November 3, 2023 ("Corrao Tr."); (4) Excerpts from the transcript of the deposition of Lauren Harps, taken on October 30, 2023 ("Harps Tr."); (5) Excerpts from the transcript of the deposition of Judieth Passman, taken on November 2, 2023 ("Passman Tr."); (6) Excerpts from the transcript of the deposition of Krishadath ("Kris") Sooknanan, taken on November 6, 2023 ("Sooknanan Tr."); and (7) Excerpts from the transcript of the deposition of James Brimberry, taken on November 9, 2023 ("Brimberry Tr."); and (8) Excerpts from the transcript of the deposition of David Gilmartin, taken on November 27, 2023 ("Gilmartin Tr.").

I.    **DELTA'S FLIGHT ATTENDANTS ARE RESPONSIBLE FOR THE SAFETY OF DELTA'S PASSENGERS.**

1.     Delta is a global airline that is responsible for safely transporting approximately 200 million customers annually to 280 destinations around the world.  (*See* " Corporate Stats and Facts" page of Delta's publicly-available website, https://news.delta.com/corporate-stats-and-facts, as that page existed on December 6, 2023.)

2.     As part of the flight crew tasked with ensuring the safe passage of all souls onboard, a Delta flight attendant's primary responsibility is the safety of passengers.  (*See* Flight Attendant Job Description, produced in this Action as the document bearing bates stamp numbers Delta 001007–Delta 001008 ("Flight Attendant Job Description"); Pl. Tr. 30:16-19.)

3.     Flight attendants are responsible for handling emergency situations related to the aircraft or to individual passengers.  (*See* Flight Attendant Job Description; Pl. Tr. 29:24–30:15.)

4.     In an emergency situation, a flight attendant may be required to operate fire extinguishing equipment, open emergency exits, deploy and inflate emergency slides, direct and lead passengers to exit the aircraft, and assist ill and injured passengers, including by using first aid techniques such as CPR and AED training.  (*See* Flight Attendant Job Description; Pl. Tr. 29:24–30:15.)

5.     To ensure flight attendants can perform their functions and ensure passenger safety, Delta maintains policies and procedures that flight attendants must be familiar with and comply with.  (*See* The Way We Fly, produced in this Action as the document bearing bates stamp numbers Delta 000621–Delta 000652 ("The Way We Fly"); Introduction to Delta's In-Flight Services ("IFS") Handbook, produced in this Action as the document bearing bates stamp number Delta 000959.)

6.      Among such policies, Delta maintains both an Alcohol Policy and an Alcohol Misuse Prevention Program which are compliant with federal regulations.  (*See* Alcohol Misuse Prevention Program, produced in this Action as the document bearing bates stamp numbers Delta 000894–Delta 000910 ("Alcohol Policy").)

7.      Employees who violate the Alcohol Policy are subject to termination.  (Alcohol Policy at pp. 1–2; Gilmartin Tr. 19:8-14.)

8.      Among other restrictions, Delta's Alcohol Policy prohibits crew members, including flight attendants, from consuming any alcohol within eight (8) hours of the time the flight attendant is required to report for duty (the "Pre-Duty Alcohol Prohibition").  (Alcohol Policy at p. 4; Pl. Tr. 50:11-18; Gilmartin Tr. 10:3-8.)

9.      Delta's Alcohol Policy does not require that a flight attendant who has been accused of violating the Pre-Duty Use Prohibition be tested for alcohol consumption but rather prohibits *any* alcohol consumption regardless of the blood alcohol level of the flight attendant.  (Alcohol Policy at p. 4; Brimberry Tr. 14:2-5; Sooknanan Tr. 11:7-10; Gilmartin Tr. 12:13-25.)

## II.    OTHER RELEVANT DELTA POLICIES.

10.     Delta maintains an Equal Employment Opportunity ("EEO") Policy that prohibits all forms of unlawful discrimination, including discrimination based on race, color, religion, national origin, creed, age, sex (including pregnancy), disability, genetic information, marital status, sexual orientation, gender identity, citizenship status, parental status, veteran status or other characteristics that may be protected by law, as well as harassment and retaliation.  (Delta's The Way We Fly at p. 10; Delta's EEO Policy, produced in this Action as the document bearing bates stamp numbers Delta 000600–Delta 000604.)

11.     Delta maintains an On-The-Job Injury ("OJI") Policy that requires employees to immediately notify their Purser or Flight Leader and Sedgwick if they incur an on-the-job injury, regardless of whether the employee believes the injury may prevent them from working.  (On-The-Job Injury Policy, produced in this Action as the document bearing bates stamp numbers Delta 001023–Delta 001028, at p. 1).

12.     Delta also requires employees to participate fully in company investigation by "providing truthful and accurate answers to questions, as well as documents or other information requested by the company."  *See* The Way We Fly at p. 23.

III.    **PLAINTIFF'S EMPLOYMENT WITH DELTA.**

13.     Delta hired Plaintiff Joan Harvey ("Plaintiff") as a flight attendant in 1991.  (Pl. Tr. 19:16-24).

14.     Plaintiff's date of birth is March 24, 1955.   (Pl. Tr. 16:13-14.)

15.     Plaintiff originally was based out of Atlanta, Georgia and transferred to New York, New York in 2011.  (Pl. Tr. 39:5-6).

16.     When Plaintiff was 51 years old, Delta promoted Plaintiff to the position of a Purser.  (Pl. Tr. 35:24–36:8).

17.     Pursers are considered "the face of Delta," and have many responsibilities, including "coordinat[ing] service and safety while serving as liaisons between the cabin crew and flight deck," and "are expected to perform to Delta's Standards of Performance."  (*See* Delta's Purser Policy, produced in this Action as the document bearing bates stamp numbers Delta 001035–Delta 001047, at p. 1.)

18.     Plaintiff reported to Field Service Manager Krishadath Sooknanan in October 2021. (Pl. Tr. 93:2-4.)

19.     Field Service Manager Sooknanan reported to Base Manager David Gilmartin. (Sooknanan Tr. 8:17–9:6.)

20.     Base Manager Gilmartin has held this position since 2012.  (Gilmartin Tr. 8:9-15.)

IV.     **PLAINTIFF'S TRIP TO ACCRA, GHANA IN OCTOBER 2021.**

21.     On October 18, 2021, Plaintiff was part of a flight crew that worked a Delta flight from John F. Kennedy International Airport ("JFK") in New York, New York to Accra, Ghana. (Pl. Tr. 37:2-17).

22.     On October 19, 2021, the flight arrived in Accra, Ghana.  (Pl. Tr. 37:7-11.)

23.     That evening, members of the flight crew, including Plaintiff, had plans to eat dinner together at a restaurant in Accra.  (Pl. Tr. 46:8-11; Email from Plaintiff to E. Pardo, dated October 27, 2021, produced in this Action as the document bearing bates stamp numbers P00038– P00041 ("Plaintiff's October 27, 2021 Statement"); Harps Tr. 13:3-10.)

24.     When the crew gathered in the hotel lobby at the agreed-upon time to travel to the restaurant, Plaintiff was not there, and the remaining crew members went to dinner together. (Harps Tr. 13:6-10.)

25.     At around 10 p.m. GMT, Plaintiff called an Uber driver, whom she identified as "Mike," to take her to get dinner at the same restaurant.  (Pl. Tr. 46:8-10; 47:23-25.)

26.     The Uber driver, Mike, ate dinner with Plaintiff.  (Pl. Tr. 47:9-25.).

27.     Other members of the flight crew observed Plaintiff in the restaurant that evening. (Pl. Tr. 49:2-9; Harps Tr. 10:7-25; Passman Tr. 12:20–13:20.)

28.     Plaintiff also was assigned to work a flight from Accra to JFK on October 20, 2021. (Delta Captain Pete Corrao Statement, produced in this Action as the document bearing bates stamp numbers Delta 000157–Delta 000158 ("Pete Corrao Statement").)

29.     The flight crew for the October 20, 2021 Accra to JFK flight were scheduled to report to the airport in Accra at 8:30 p.m. GMT (4:30 p.m. EST).  (Pete Corrao Statement.)

30.     The flight crew, including Plaintiff, stayed at the Kempinski Hotel during their layover in Accra.  (Pl. Tr. 38:14-16.)

31.     On October 20, 2021, between approximately 3:30 p.m. and 4:30 p.m. GMT, i.e., four to five hours before the report time for the return flight to JFK, Delta Captain Pete Corrao and Delta Flight Attendant Lauren Harps observed Plaintiff sitting alone at a table near the hotel pool. (Pete Corrao Statement; Lauren Harps Statement, produced in this Action as the document bearing bates stamp numbers Delta 000159–Delta 000160 ("Lauren Harps Statement"); Corrao Tr. 13:3-11, 14:9-15; Harps Tr. 26:7–27:5.)

32.     Prior to the trip to Accra, Plaintiff had never flown with Flight Attendant Harps. (76:21-22.)

33.     Prior to the trip to Accra, Plaintiff had never spoken to or seen Captain Corrao.  (Pl. Tr. 99:5-23.)

34.     Captain Corrao observed a Stella chalice on Plaintiff's table by the pool that he believed contained  beer.  (Pete Corrao Statement; Corrao Tr. 14:12-15.)

35.     Flight Attendant Harps observed a beverage on Plaintiff's table that appeared to be a beer.  (Lauren Harps Statement; Harps Tr. 31:8-16.)

36.     Captain Corrao observed Plaintiff physically drinking about half of this beverage. (Pete Corrao Statement; Corrao Tr. 23:6-7.)

37.     Flight Attendant Harps observed that half of the beverage appeared to have been consumed.  (Lauren Harps Statement; Harps Tr. 76:8-10.)

-6-

38.     Neither Captain Corrao nor Flight Attendant Harps observed another individual sitting with Plaintiff at any time.  (Lauren Harps Statement; October 22, 2021 Suspension Meeting Summary, produced in this Action as the document bearing bates stamp numbers Delta 000151– Delta 000152 ("Suspension Meeting Summary").)

39.     Captain Corrao spoke with Plaintiff while she was sitting at the pool and questioned her about whether she was drinking an alcoholic beverage.  (Pete Corrao Statement; Lauren Harps Statement; Corrao Tr. 12:22–13:23; Harps Tr. 46:20–48:2; Pl. Tr. 71:14–72:11.)

40.     Captain Corrao did not make any comments about Plaintiff's race or her age during this conversation.  (Pl. Tr. 73:8-13.)

41.     Based on his observations of Plaintiff and Plaintiff's responses, Captain Corrao and Flight Attendant Harps believed that Plaintiff violated Delta's Pre-Duty Alcohol Prohibition.  (Pete Corrao Statement; Lauren Harps Statement; Corrao Tr. 12:22–13:23; Harps Tr. 46:20–48:2; Pl. Tr. 71:14–72:11.)

42.     Captain Corrao informed Plaintiff that he would be contacting Judieth Passman, the Flight Leader for the return flight to JFK, about his belief that Plaintiff had violated Delta's Pre-Duty Alcohol Prohibition.  (Pete Corrao Statement; Lauren Harps Statement; Corrao Tr. 12:22–13:23; Harps Tr. 46:20–48:2; Pl. Tr. 71:14–72:11.)

43.     Captain Corrao then met with Purser Passman and relayed to Purser Passman his observations about Plaintiff at the pool.  (Pete Corrao Statement; Lauren Harps Statement; Judieth Passman Statement, produced in this Action as the document bearing bates stamp number Delta 001086 ("Judieth Passman Statement"); Corrao Tr. 13:24–14:4; Harps Tr. 48:13-22; Passman Tr. 16:6–17:10.)

44.     At approximately 5:15 p.m. GMT (1:15 p.m. EST), Purser Passman and Captain Corrao called New York Base Manager David Gilmartin and informed Base Manager Gilmartin about Captain Corrao's and Flight Attendant Harps' observations of Plaintiff at the pool.  (October 20, 2021 Note to File, produced in this Action as the document bearing bates stamp numbers Delta 000154–Delta 000155 ("October 20, 2021 Note to File"); Corrao Tr. 14:5-8; Passman Tr. 17:11-14; Gilmartin Tr. 24:10-20.)

45.     Base Manager Gilmartin prepared notes summarizing this telephone conversation.  (October 20, 2021 Note to File.)

46.     Captain Corrao reported to Base Manager Gilmartin that he spoke with Plaintiff and confirmed she was scheduled to work the return flight to JFK that evening.  (October 20, 2021 Note to File; Passman Tr. 23:20–24:14.)

47.     Captain Corrao reported to Base Manager Gilmartin that when he spoke with Plaintiff, she stated that she "only had a few sips of beer."  (October 20, 2021 Note to File; Gilmartin Tr. 25:11-14; Corrao Tr. 17:19-25.)

48.     Captain Corrao reported to Base Manager Gilmartin that the hotel did not serve non-alcoholic beer.  (October 20, 2021 Note to File.)

49.     Captain Corrao reported to Base Manager Gilmartin that Plaintiff asked if Delta's Alcohol Policy required her to stop drinking four or eight hours before reporting for duty.  (October 20, 2021 Note to File; Gilmartin Tr. 57:6-14.)

50.     Base Manager Gilmartin then called the Operational Customer Center ("OCC") and informed OCC Manager Pedro Ramos about the report he had received regarding Plaintiff drinking in Accra.  (October 20, 2021 Note to File; Gilmartin Tr. 33:22–34:11.)

51.     OCC Manager Pedro Ramos then spoke with Delta's Substance Testing Team, who recommended that Plaintiff should be removed from the flight.  (October 20, 2021 Note to File.)

52.     Delta does not test for alcohol at the Accra airport and does not have the capacity to do so. (Gilmartin Tr. 17: 8-13; Declaration of David Gilmartin ("Gilmartin Decl."), at ¶ 3.)

53.     Base Manager Gilmartin documented a summary of the telephone conversations with OCC Manager Ramos and the Substance Testing Team.  (October 20, 2021 Note to File.)

54.     Based on the information received from Captain Corrao and Purser Passman and the guidance provided by the Substance Testing Team, Base Manager Gilmartin made the decision to remove Plaintiff from the return flight from Accra to JFK.  (October 20, 2021 Note to File; Gilmartin Tr. 37:5-21).

55.     After Purser Passman spoke with Base Manager Gilmartin, she received a call from Plaintiff. (Pl. Tr. 77:14-22; Passman Tr. 29:6-9; Judieth Passman Statement.)

56.     During the call, Plaintiff claimed to Purser Passman that she had sprained her ankle the night before when going out to dinner and wanted to be removed from working the trip that evening.  (Passman Tr. 29:6-13; Harvey October 22, 2021 Statement, produced in this Action as the document bearing bates stamp number Delta 000156 ("Harvey October 22, 2021 Statement"); Judieth Passman Statement.)

57.     Plaintiff's call to Purser Passman, made after she had been confronted about drinking before her flight, was the first time Plaintiff spoke with anyone at Delta about her request to be removed from the flight due to a purported on-the-job injury.  (Pl. Tr. 61:24–62:2-9, 63:22-23, 66:21-25; Judieth Passman Statement; Harvey October 22, 2021 Statement.)

58.     Purser Passman did not make any comments about Plaintiff's race or Plaintiff's age during the call.  (Pl. Tr. 79:25–80:6.)

-9-

59.     After Plaintiff spoke with Purser Passman, she received a call from Base Manager Gilmartin and OCC Manager Ramos.  (Pl. Tr. 80:7-9; Gilmartin Tr. 35:7-14; Harvey October 22, 2021 Statement; October 20, 2021 Note to File.)

60.     During that call, Base Manager Gilmartin informed Plaintiff that she was being removed from the flight from Accra to JFK.  (Pl. Tr. 80:24–81:6; Gilmartin Tr. 37:10-18; Harvey October 22, 2021 Statement; October 20, 2021 Note to File.)

61.     Base Manager Gilmartin documented a summary of this telephone conversation with the Plaintiff.  (October 20, 2021 Note to File.)

62.     Base Manager Gilmartin's summary of his call with Plaintiff includes the following notes:

- Joan was advised by David of the concerns that she was drinking a beer within 8 hours of report time by the pool

- Joan said that the beer belonged to a friend. She was asked who the friend was and she said "it was somebody from the outside who lives in Accra"

- Joan was advised that she was seen sipping the beer and didn't deny it when the Captain spoke to her. She said the Captain was very abrupt with her

- Joan was advised that she would be deadheading to base. Joan asked if she could deadhead the next day and get her ankle treated and she was told that would be best

- Joan was asked to provide a statement to her [Field Service Manager ("FSM")] Kris Sooknanan and not to discuss the situation with others[.]

(October 20, 2021 Note to File; Gilmartin Tr. 36:23–37:4.)

63.     Base Manager Gilmartin did not make any comments about Plaintiff's race or Plaintiff's age during the call.  (Pl. Tr. 83:2-7.)

64.     On October 20, 2021 at 11:48 p.m. EST, Purser Passman submitted the following written statement to Base Manager Gilmartin via email:

David,

This email is a written report to follow up with our conversation between you, myself and Captain Peter Corrao on October 20, 2021.

On October 20, 2021, flight attendant Lauren Harps and Captain Peter Corrao both witnessed flight attendant Joan Harvey having a meal along with a beer at the pool bar at the Kempinski Hotel in Accra at approximately 16:00 local Accra time. Our scheduled report was 20:30. Captain Corrao spoke with F/A Harvey and inquired if she was intending to fly back to JFK this evening as scheduled. She replied she was so Captain Corrao inquired as to why she was drinking a beer within the 8 hours prior to report. He reported to me his observation of her having a beer and his conversation with her. I will leave it to Captain Corrao to report his conversation since I did not witness any of the event or conversation. After Captain Corrao contacted me and we discussed the situation, we decided to contact you, David. It was determined the OCC would contact F/A Harvey, have her removed from the rotation and return to base on another flight. After our conversation, F/A Harvey contacted me in my hotel room. I asked if she was ok. She replied she was. I was under the assumption she had been contacted by the OCC at this point but she had not. I then asked if OCC had contacted her and she replied they had not. I told her they would be contacting her and she would be removed from the trip and she would deadhead home the next day. F/A Harvey said the reason she was calling me was to tell me she had sprained her ankle and would be calling off the trip. **She said she had a beer because she knew she would not be returning with us.** I explained that the Captain nor I were aware of her sprained ankle and while having her beer within 8 hours of report, she had still not contacted scheduling to be removed. She said she was waiting to see if her ankle would get better before calling out but that still left the issue of consuming alcohol within the 8 hours prior to sign in. When speaking with F/A Harvey, there were contradictions in her story so I'm not sure what her intentions were in regard to calling in sick or working the flight. I also spoke with F/A Lauren Harps who concurred with the Captains version of events. I've asked her to email you a written report.

I'm sorry this happened. In 32 years of flying, I've never encountered this situation. I believe the Captain and I handled this as delicately as possible. The remainder of our crew were advised F/A Harvey would not be returning with us due to a sprained ankle. If you have any questions, please feel free to contact me.

Judieth Passman

(Judieth Passman Statement (emphasis added).)

65.    Purser Passman also submitted a statement through Delta's Safety Reporting System ("SRS"), which stated:

> On the layover in ACC, Captain Peter Corrao and flight attendant Lauren Harps observed flight attendant Joan Harvey having a meal and a beer at the Kempinski hotel pool bar at approximately 1600 local ACC time.  Pick up for the flight to JFK was scheduled for 2030.  Captain Corrao spoke with FA Harvey to see if she was returning to JFK as scheduled.  She advised she was and he then questioned her as to why she was having a beer when pick up was only 4.5 hours away.  Capt Corrao then contacted me to discuss the situation and we decided to call IFS Leader David Gilmartin at JFK.  After a conversation between Capt Corrao, David and myself, it was determined FA Harvey would be contacted by the OCC and removed from the rotation.  I also spoke with FA Lauren Harps and her version of the story concurred with Capt Corrao[.]

(SRS Statement prepared by J. Passman, produced in this Action as the document bearing bates stamp numbers Delta 001084–Delta 001085.)

66.      Plaintiff called Flight Attendant Harps the day after the incident at the pool.  (Harps Tr. 59:2-4; Lauren Harps Statement.)

67.      On October 21, 2021 at 11:12 a.m. EST, Captain Corrao submitted the following written statement to Base Manager Gilmartin via email:

> I was the captain working flight DL157 ACC –JFK 20 OCT 2021.  Our scheduled departure time from the Kempinski Hotel was 2030L.
>
> I was at the pool between 1430L –1600L, having lunch poolside. F/A Lauren Harps joined me poolside at approximately 1530L.  She immediately noticed F/A Joan Harvey at the small pool bar/restaurant, adjacent to the pool, having lunch, with a draft beer, and brought it to my attention. Joan had been there a while, but I did not recognize her as one of our working flight attendants.  Lauren was certain it was Joan. By that time, I did witness she had drunk about half the beer. (The draft beer was in a Stella chalice).  I decided I needed to confront Joan immediately to ensure that it was her.  I asked her, very politely, "are you Joan Harvey?"  She responded "yes."  I asked her if she was working our return flight to JFK this evening. She responded "yes."  I then asked her why she was drinking so close to report. She responded **"oh, I wasn't drinking, I only had a few sips."**  I told her that I witnessed her drinking about half the beer.  She responded that she wasn't a big drinker, and that the waiter had brought her the beer, but she refused.  I told her that I witnessed her drinking half the beer.  She then asked me what the drinking rule is, and she implied she thought it was four hours prior to report.  (Or something to that effect)  I then ended the conversation, very politely and respectful, by saying I will need to speak with the purser, Judy Passman, about the situation.  She then mumbled something about her ankle being hurt.  I then departed to speak with Purser Judieth Passman.

I spoke with F/A Passman, privately in her room, regarding what I had witnessed. She then called her F/A supervisor David Gilmartin. F/A Joan Harvey was removed from the flight.

Sincerely,

Pete Corrao

(Pete Corrao Statement (emphasis added); Corrao Tr. 26:7-9; Gilmartin Tr: 30:5-14.)

68.    On October 21, 2021 at 3:08 p.m., Flight Attendant Harps submitted the following

statement to Base Manager Gilmartin via email:

Hi David,

Please see below for my statement regarding the incicdent [sic] at the ACC hotel on October 20th on rotation 1051. I arrived at the pool around 15:45 & I spotted Captain Pete and sat next to him. We were chatting as I ordered food and he was eating. We spotted flight attendant Joan

Harvey at a table by herself eating food and drinking a beer (this was around 16:00). It appeared the beer had been half drank and we were trying to investiagte [sic] from afar if that was a second one. Both Pete and I confirmed the crew list and that it was Joan Harvey. He confronted her (I was not within ear shot of the conversation) and Pete came back over. I will allow Pete to relay this conversation himself. He said he would handle speaking to the purser and speaking with Delta and we exchanged contact info. Pete left and I began eating my food. Joan then came over and was slightly upset/concerned about the interaction and said that she didn't realize what time it was and seemed confused on the alcohol policy. She also mentioned she had a severely sprained ankle and that she was thinking that she wouldn't be able to work/would call out. I tried to avoid any type of confrontation or saying that Pete was going to contact the purser, etc. to avoid any further issues with the incident. Judi messaged me about coming to chat with her about what I saw so I discreetly left and recounted the incident to her in her room.

Please feel free to reach out if you have any questions.

Thanks,

Lauren Harps

(Lauren Harps Statement; Harps. Tr. 66:15-16; Gilmartin Tr. 63:15-25.)

69.    On October 21, 2021 at 4:31 p.m., Captain Corrao submitted the following

additional statement to Base Manager Gilmartin via email:

-13-

To be clear, I witnessed F/A Joan Harvey, pick up the Stella chalice filled with what looked like draft beer, put the glass to her lips and take several sips. I witnessed this two times during my poolside lunch. From what I observed, she had consumed half a glass of beer.

Sincerely,

Pete Corrao

(Pete Corrao Statement; Corrao Tr. 26:14-17; Gilmartin Tr: 30:8-17.)

70.     On October 21, 2021 at 4:45 p.m., Flight Attendant Harps submitted the following

additional statement to Base Manager Gilmartin via email:

Hi David,

I wanted to update my statement to include that we saw the beer drank down but I didn't see her actually take a drink. I was at the pool for quite a while and did not see her with a friend. I want to also mention that she called me this afternoon and I told her I could not give out what my statement was and that I was feeling backed into a corner.

Thanks,

Lauren

(Lauren Harps Statement; Harps. Tr. 66:15-16; Gilmartin 64:2-5.)

71.     On or around October 22, 2021 Plaintiff submitted the following written statement

to Delta:

I was on my layover [o]n the 20 oct. about 1:30 local time in [G]hana. I was having lunch outside near the pool area. White man approached me. He started by asking me my name then .. which I replied …he said to me why are [yo]u drinking a when [yo]u are flying back on the flight tonight. I replied sir I am not drinking .. he then said I saw [yo]u have a beer. I said once again I have a nonalcoholic drink. He became very aggressive and belligerent toward me .. and stated he was going to call the purser and let delta know what he saw .. I then tired [sic] to tell him again I was not drinking.. his accusations and harassment because very loud and I became very nervous of what he was accusing me of. My friend ..I tired [sic] to explain to him that my injury to my ankle did not warrant me to fly back. He kept saying I was drinking .. I immediately went to my room to call my purser to let her know I was not going to be able to work due to my ankle .. as I call the purser she informed me that he had removed [me] from the flight. At that time I got a call from the base

-14-

manager [Gilmartin], who informed me of what had happened.  I explained to [Mr. Gilmartin] of my situation.  I call[ed] and created a report of my ankle[.] these allegations were false and he had no proof of me drinking.  My drink was nonalcoholic[.]  He was threatening toward me.  As a pilot he had no compassion toward my ankle.  He never inquired to see if I was ok or needed help.  He found it necessary to leave me in a [sic] international country. I felt very abondon [sic].  His baseless allegations caused me to be removed from the trip and he has no proof of me drinking alcohol.[]  I am saddened that my company took his word as fact.  I am horrified that this has happened to me. .. 30 years of flying and I would never put myself in this situation.  I was not in uniform I was not on the aircraft[].  I was outside with others around me.  I was not intoxicated in any way but being accused of something that he thought he saw.  He really had no reason to approach me or to me[.]

(Harvey October 22, 2021 Statement; SRS Statement prepared by J. Harvey, produced in this Action as the document bearing bates stamp numbers Delta 001081–Delta 001084; October 22, 2021 Suspension Meeting Summary, produced in this Action as the document bearing bates stamp numbers Delta 000151–Delta 000152 ("Suspension Meeting Summary"); Gilmartin Tr. 51:4-13.)

## V.  PLAINTIFF'S SUSPENSION AND REVIEW FOR TERMINATION OF EMPLOYMENT.

72.    On October 22, 2021, Plaintiff flew back to JFK and met with FSM Shannon Kelly and Base Manager Gilmartin joined the meeting via phone. (Pl. Tr. 89:12-13; 89:25–90:3; Suspension Meeting Summary; Gilmartin Tr. 68:13-19.)

73.    Base Manager Gilmartin documented a summary of this conversation with the Plaintiff.  (Suspension Meeting Summary; Gilmartin Tr. 68:9-14.)

74.    Base Manager Gilmartin's summary includes the following notes of the suspension meeting:

- Joan was asked if she was doing okay and she said she was doing better.  David reminded Joan that there were follow up questions about the concerns brought forth about the consumption of alcohol within 8 hours before pick up (3.5 hours to be exact)

- Joan said she was shocked by the Captain's allegations and denied it and said the beer belong to a friend of hers

-15-

- Joan was asked who the friend was and she said his name was "Ebenezer." David asked if Ebenezer was a hotel guest and she said he was not

- David pointed out that none of the crewmembers saw Ebenezer.  She said he was there earlier. David countered that we have an eyewitness that she drank the beer and waitstaff brought her a refill

- Joan stated that it was a no- alcoholic cider that she was having with her lunch. David asked why she didn't mention that on the phone when he called her on Wednesday 10/20 with OCC Manager Pedro Ramos.  She said she was nervous and startled by the accusations and not thinking clearly.  David pointed out to her that she told the Captain "she only had a few sips" and asked if the regulation around drinking alcohol was four hours vs 8 hours

- David asked why she contacted a crewmember yesterday (10/21 Lauren Harps). She said she wanted to see what was being reported to Delta. David told Joan that was not appropriate and reminded her she was not to discuss this investigation with others and not to let it happen again

  [. . .]

- Joan asked [if] we would take the pilots word over her word. She [was] reminded that it was not just the pilot and that her story kept changing and was not consistent

(Suspension Meeting Summary; Gilmartin Tr. 68:9-14.)

75.     At the meeting, Plaintiff was presented with a copy of her written statement, which she signed.  (Harvey October 22, 2021 Statement; Pl. Tr. 112:9–113:3; Gilmartin Tr. 51:8-18.)

76.     At the meeting, Base Manager Gilmartin informed Plaintiff that she was being suspended without pay for violating the Pre-Duty Use Prohibition of Delta's Alcohol Policy and for providing inconsistent statements to Delta regarding the incident.  (Suspension Meeting Summary.)

77.     Base Manager Gilmartin did not make any comments about Plaintiff's race or age during the suspension meeting.  (Pl. Tr. 116:25–117:6.)

78.     After the meeting, Plaintiff submitted a photograph of what she claims was an invoice from the Kempinski Hotel for all charges and credits she incurred during her two-day stay

at the hotel.  (Photograph of Purported Receipt from Kempinski Hotel, produced in this Action as the document bearing bates stamp number Delta 000153; Pl. Tr. 130:11-18.)

79.     After the meeting, Plaintiff also submitted to Delta a photograph of what she claims was a written but unsigned statement prepared by an individual who purported to be a waiter who served Plaintiff at 1:30 p.m. GMT at the Pool Bar of the Kempinski Hotel.  In the statement, the purported waiter claims that Plaintiff ordered "Friel's Cider."  (Photograph of Purported Statement from Pool Bar Waiter, produced in this Action as the document bearing bates stamp number Delta 000551; Pl. Tr. 94:2-20; Gilmartin Tr. 79:25–80:3.)

80.     Following the meeting, Base Manager Gilmartin obtained a copy of the menu from the Kempinski Hotel.  (Gilmartin Tr. 79:23-24; Kempinski Hotel Menu, produced in this Action as the document bearing bates stamp numbers Delta 000240–Delta 000245 ("Hotel Menu").)

81.     The menu lists "Friel's Vintage Cider" in the category under the heading "Bottled Beer."  (Hotel Menu at p. 5.)

82.     Following the meeting, Base Manager Gilmartin and FSM Sooknanan reviewed the documents collected regarding the October 21, 2021 incident—including the witnesses' statements, Plaintiff's statement, and Base Manager Gilmartin's summary of the suspension meeting with Plaintiff, the purported receipt, the purported bartender statement, and the hotel menu.  (Recommendation for Termination of Employment, dated October 22, 2021, produced in this Action as the document bearing bates stamp numbers Delta 000145–Delta 000147 ("October 22, 2021 Recommendation for Termination"); Executive Summary, dated October 24, 2021, produced in this Action as the document bearing bates stamp numbers Delta 000148–Delta 000150 ("Executive Summary"); Gilmartin Tr. 79:9-24.)

-17-

83.     Based on their review of those documents and understanding of Delta's Alcohol Policy, Base Manager Gilmartin and FSM Sooknanan recommended that Plaintiff's employment be terminated based upon her violation of Delta's Alcohol Policy and her lack of candor during the investigation.  (October 22, 2021 Recommendation for Termination; Sooknanan Tr. 37:24–38:10; Executive Summary; Gilmartin Tr. 93:5-9.)

84.     Base Manager Gilmartin's and FSM Sooknanan's recommendation for termination was reviewed and approved by Delta Senior Base Manager Carla Bourdier.  (October 22, 2021 Recommendation for Termination of Employment.)

85.     On October 27, 2021 at 2:54 p.m., Plaintiff submitted a written statement to Emily Pardo, a Human Resources Manager for Delta's IFS.  (Email from Plaintiff to E. Pardo, dated October 27, 2021, produced in this Action as the document bearing bates stamp numbers P00038–P00041 ("Plaintiff's October 27, 2021 Statement").)

86.     Plaintiff's written statement stated, in relevant part:

**I dined with an old friend at the pool area.  I had a full meal of chicken and rice with my friend.  We ordered a cider.  He sat with me for approximately 30-40 minutes then departed.**  The flies were crazy so I moved to another table. . . . a man (who I now know was our acting captain) approached me asking why I was drinking beer and if I was flying tonight.  He also reminded me that it was close to report time and that I am not suppose [sic] to be drinking beer.  This man did not identify himself to me.  He accused me of drinking beer I immediately responded, " Sir I am not drinking beer and not flying back tonight because of an injury."  He proceeds....."  I saw you drinking beer and I am going to tell the purser and Delta!"

(Plaintiff's October 27, 2021 Statement (emphasis added).)

87.     On October 28, 2021, HR Manager Pardo prepared a recommendation concurring with FSM Sooknanan's recommendation for termination.  (Recommendation for Termination, dated October 28, 2021, produced in this Action as the document bearing bates stamp number Delta 000144.)

-18-

88.     On November 17, 2021, Delta received a letter from an attorney who represented

Plaintiff, which stated, in part:

> **Ms. Harvey's next course of action was to take Motrin but didn't want to do so on an empty stomach.  To that end, she sat by the pool and ordered chicken, rice and a non-alcoholic apple cider.**  While eating by the pool, Ms. Harvey also tried to contact Delta several times in order to call in sick and not fly back later that evening.  Unfortunately, the internet by the pool was spotty at best and her calls kept dropping.  She decided to finish her lunch and then return to her room where the internet connection may be better in order to contact Delta.

(Letter from A. Altman to D. Gilmartin, dated November 17, 2021, produced in this Action as the

document bearing bates stamp numbers Delta 000246–Delta 000248 (emphasis added).)

89.     That same day, HR Manager Pardo reviewed the lawyer letter and noted the

following:

> There are some discrepancies in the information in the attorney's letter.  There is no mention of her local friend who she claimed the "beer" belonged to at times, no mention of her confusion about the 8-hour rule, says she told the Captain she was not drinking alcohol (per his statement she said she only had a few sips), etc.

(Email from E. Pardo, dated November 17, 2021 at 2:25 p.m., produced in this Action as the

document bearing bates stamp numbers Delta 000434–Delta 000437 ("November 17, 2021 Email

Exchange"), at p. 3.)

90.     HR Manager Pardo and Terrence Jackson (General Manager – Human Resources

– IFS) then re-reviewed the purported invoice that Plaintiff submitted from the Kempinski Hotel.

(November 17, 2021 Email Exchange at pp. 2–3.)

91.     At HR Manager Pardo's request, Base Manager Gilmartin called the Kempinski

Hotel and spoke with the front desk manager and a bartender at the hotel.  (November 17, 2021

Email Exchange at pp. 1–2; Gilmartin Tr. 87:3-8.)

92.     Base Manager Gilmartin was told by two individuals that he spoke with that the hotel does not serve non-alcoholic cider and only serves alcoholic cider.  (November 17, 2021 Email Exchange at p. 1; Gilmartin Tr. 87:12-18.)

## VI.   PLAINTIFF'S TERMINATION FROM DELTA AND APPEAL.

93.     On December 6, 2021, FSM Sooknanan and Andrea Misserian (IFS Northeast Region Director) flew to Atlanta to meet with Plaintiff and inform her of her termination.  (Pl. Tr. 147:9-21.)

94.     Regional Director Misserian was the senior most director in the region and, per Delta policy, attended the termination meeting as a sign of respect because Plaintiff had accrued over twenty years of service.  (Gilmartin Tr. 98:21–99:7.)

95.     The basis for Plaintiff's termination was her violation of Delta's Alcohol Policy and lack of candor during the investigation into that violation.  (Pl. Tr. 140:3-6; Sooknanan Tr. 52:21-24; Brimberry Tr. 68:7-18; Gilmartin Tr. 93:5-9.)

96.     During the meeting, no one made any comments about Plaintiff's race or her age. (Pl. Tr. 149:13–150:2.)

97.     On December 30, 2021, Plaintiff submitted a written statement to Robert Heillmann (Director, Human Resources) that stated in part:

> On October 20, 2021, I was on a layover in Accra.  While sitting at the pool area grill, I was approached by a Delta pilot by the name of Peter.  **I placed an order at the grill which included chicken and rice, and a malt cider.  A friend of mine from Accra came to visit me and he ordered a beer but left the hotel before 2pm because of the traffic.**  I moved to another table due to the flies at my original seating area, and the waiter assisted by moving my beverage and my friend's beverage to table.  The waiter wasn't aware that my friend had left the hotel.

-20-

(Pl. Tr. 152:3-23; Harvey December 30, 2021 Statement, produced in this Action as the document bearing bates stamp numbers Delta 000364–Delta 000365 (emphasis added).)

98.     That same day, Jennie Ho (Vice President, IFS Operations) responded to Plaintiff and requested to schedule a time to speak with Plaintiff "to better understand the circumstances from [her] perspective."  (Pl. Tr. 153:12-16; Email from J. Ho dated December 30, 2021 at 9:23 PM, produced in this Action as the document bearing bates stamp number Delta 000364.)

99.     On January 7, 2022, HR Director Heilmann left a voicemail for Plaintiff stating that Delta's Equal Opportunity ("EO") Office would conduct an independent review of Plaintiff's termination.  (R. Heilmann email dated January 7, 2022 at 3:30 pm, produced in this Action as the document bearing bates stamp number Delta 000363.)

100.    On January 25, 2022, Delta opened an Equal Opportunity ("EO") appeal case for Plaintiff on January 25, 2023.  (Harvey EO Case Summary, produced in this Action as the document bearing bates stamp numbers Delta 000911–Delta 000915 ("Harvey EO Case Summary").)

101.    Plaintiff's appeal was assigned to James Brimberry, the EO Manager.  (Email from J. Brimberry, dated February 4, 2022 at 3:47 PM, produced in this Action as the document bearing bates stamp number Delta 000924 ("J. Brimberry February 4, 2022 Email"); Brimberry Tr. 23:9-16; Harvey EO Case Summary.)

102.    That same day, January 25, 2022, Delta's EO Office attempted to contact Plaintiff to schedule a call to discuss her appeal.  (J. Brimberry February 4, 2022 Email.)

103.    On February 4, EO Manager Brimberry sent Plaintiff an email and left her a voicemail in an effort to schedule a discussion about her EO appeal.  (J. Brimberry February 4, 2022 Email.)

104.     Plaintiff asked her friend Helen Samson David to write a statement regarding the incident at the hotel pool.  (Pl. Tr. 219:19-25).

105.     Plaintiff sent Helen Samson David money electronically so she could take an Uber to an internet bar in Accra and write a statement for Plaintiff.  (Pl. Tr. 223:2-22).

106.     The statement from Helen Samson David dated February 6, 2022 states:

> Dear sir/madam
>
> I'm writing this letter in reference to miss Harvey, a member of Delta airline cabin crew.  I want to use this opportunity to say she has been a great friend and will also say a great flight attendant, I have known her for [a] while now, she has always spoke highly of her job and has been very happy and proud to work for Delta.  [W]e where [sic] together on the 20th of October
>
> **We both shared lunch at the pool grill side, inside the kempinski hotel Ghana.  I ordered rice, chicken and coke while miss Joan had only rice and malt.**  I want to use this medium to humbly plead on her behalf to be recalled as a delta cabin crew which will be very much appreciated, thank you for your cooperation we look forward to a positive reply from you
>
> Yours sincerely
>
> Helen Samson David

(Helen Samson David Statement, produced in this Action as the document bearing bates stamp number Delta 000456 (emphasis added).)

107.     EO Manager Brimberry spoke to Plaintiff on February 23, 2022.  (Harvey April 12, 2022 Appeal Letter, produced in this Action as the document bearing bates stamp numbers Delta 000938–Delta 000939 ("Harvey April 12, 2022 Appeal Letter"); Brimberry Tr. 39:2-10; Pl. Tr. 162:21–163:9).

108.     On March 1, 2022, Plaintiff submitted a statement to Mr. Brimberry that stated in part:

On oct 18 I was on my assignment rotation 1051 Jfk to acc. I worked as the service leader.. we landed on October 19 2021.  On October 19 while trying to get dinner in acc I took a Uber driver to get food. It had started to rain.  As I was walking to the car.  I slipped and sprain my ankle pretty badly.  **The driver took me back to the hotel.  Because I had ask the driver if he could return the next day to talk me to get some meds or a wrap for my ankle he returned to the hotel the Kempinski to assist me.  I offered him lunch because he said he was hungry.  We went to the pool restaurant.  We sat inside.  But because he had a ride later after eating he left.  I moved out side [sic] around the pool area.  The waiter that had serve[d] us brought my drink outside.  But he didn't realize that my friend the Uber driver had left.  So he brought my chicken and left over outside.  He also brought the left over beer that my friend had left behind out to my new sitting table ... but as I sat outside the waiter started getting busy with others.  When he came back to my table .. a fly has [sic] gotten in to the left over beer that my friend had left behind.  So the waiter came back with a small glass that looked like the cider that I was drinking.  He place it on the table.** A few minutes after being out side [sic] a lady that I realize was Lauren that flew on the trip with me said hello. [S]he was sitting with a man but because Lauren had on a swim suite [sic] and no mask I didn't recognize her. She said hello.  I spoke.  Later a man walk[ed] up to me and ask me why was I having a beer if I was working back in the flight tonight. I said I wasn't having a [b]eer.  He kept up the nonsense of me [c]onsuming alcohol before a trip.  He never said who he was.  I later found out it was the captain.  [I] [e]xplained to him that I was not having alcohol I had a cider...he then say [sic] he was going to call Delta and let the person know that I was drinking alcohol I tried to explain to him that I did hurt my ankle I was only having lunch with a friend he said he didn't see anybody sitting with me but he was not listening to my story and he stormed off to go call Delta... Now in the meantime my sister had called me and said my neighbor said that it was a fire in my neighborhood [] but didn't know exactly whom house had been damaged.  So I went to my room to call the purser Brenda.  I was informed that the captain had called her and I also called Delta and had me removed from the flight because he said he saw the consuming alcohol.[] A few minutes later my cell phone rang and it was David Gilmartin the base manager of New York.. himself and another man was [sic] on the phone he told me he had to remove me from the flight because the captain had said that I was consuming alcohol four hours before pick up.  **I explained to Mr. Gilmartin my situation with sitting with my friend and the waiter got our drinks confused and he brought the beer that**

-23-

**my friend had left behind because it had a fly in it I picked the glass up thinking it was my drink and as I picked it up I noticed that it wasn't so I put it back down... Now at this point in speaking with Mr. Gilmartin he also was accusing me of having alcohol .... I explained that I had a non alcoholic beverage.** I ask if I could go to the dr [sic] because [] I hurt my ankle.  And that I tired [sic] to get through to delta earl[ier] but was on hold for so long.  My phone was not getting a connection

(J. Harvey Email dated March 1, 2022 at 2:06 AM, produced in this Action as the document bearing bates stamp number Delta 000925 (emphasis added).)

109.    Based on its review of the information Plaintiff submitted and the circumstances surrounding her termination, Delta denied Plaintiff's appeal of her termination on April 12, 2022. (Harvey April 12, 2022 Appeal Letter; Brimberry Tr. 67:10-15; Pl. Tr. 165:13-20).

## VII.    <u>PLAINTIFF'S CLAIMS OF DISCRIMINATION.</u>

110.    In the past five (5) years, only one other Flight Attendant based in New York has violated Delta's Pre-Duty Alcohol Prohibition.  (*See* Flight Attendant Performance Development Chart, produced in this Action as the document bearing bates stamp numbers Delta 001076–Delta 001080 ("FA Performance Development Chart").)

111.    That Flight Attendant, who identifies as two or more races and whose date of birth is September 26, 1996, was also terminated.  (*See* FA Performance Development Chart.)

112.    It is a standard Delta policy that employees eligible to retire may decide to do so in lieu of termination.  (Gilmartin Decl. at ¶ 4.)

Dated: December 6, 2023                MORGAN, LEWIS & BOCKIUS LLP
         New York, New York

By: */s/ Ira G. Rosenstein*
    Ira G. Rosenstein
    Michael F. Fleming
    Alanna N. Fichtel
    101 Park Avenue
    New York, New York 10178
    Tel: (212) 309-6000
    Fax: (212) 309-6001
    ira.rosenstein@morganlewis.com
    michael.fleming@morganlewis.com
    alanna.fichtel@morganlewis.com

    *Attorneys for Defendant Delta Air Lines*