**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

JOAN HARVEY,

                        Plaintiff,

            - against –

DELTA AIR LINES, INC.,

                        Defendant.

**Civil Action No. 1:23-cv-02662-HG**

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF
DELTA AIR LINES, INC.'S MOTION FOR SUMMARY JUDGMENT**

**MORGAN, LEWIS & BOCKIUS LLP**
Ira G. Rosenstein
Michael F. Fleming
101 Park Avenue
New York, NY 10178-0060
Phone: (212) 309-6000
Fax: (212) 309-6001
ira.rosenstein@morganlewis.com
michael.fleming@morganlewis.com

*Attorneys for Defendant Delta Air Lines, Inc.*

Dated: March 14, 2024

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................. 1

RELEVANT FACTUAL BACKGROUND ....................................................................... 2

    A.    Delta Hired Plaintiff for a Safety-Sensitive Position. ........................................ 2

    B.    Delta Thoroughly Investigated and Concluded, Based on All Available
        Evidence, that Plaintiff Violated the Pre-Duty Use Prohibition. .......................... 8

    C.    Plaintiff's Story Changed Several More Times Following Her
        Termination. ......................................................................................................... 12

ARGUMENT ................................................................................................................... 14

I.      STANDARD OF REVIEW. ...................................................................................... 14

II.    PLAINTIFF CANNOT ESTABLISH A BASIS TO PROCEED ON ANY OF
        HER DISCRIMINATION CLAIMS. ....................................................................... 15

    A.    Plaintiff Has No Evidence That Raises an Inference of Discrimination. ............ 17

        1.    Plaintiff Cannot Identify A Similarly Situated Comparator Who
            Engaged in Comparable Conduct And Was Treated More
            Favorably. ............................................................................................... 19

        2.    Plaintiff's Subjective Beliefs About What Was Required Under
            Delta's Alcohol Policy Cannot Raise An Inference of
            Discrimination ........................................................................................ 21

    B.    Delta Had Legitimate, Non-Discriminatory Reasons to Suspend and
        Terminate Plaintiff's Employment. ..................................................................... 22

    C.    Plaintiff Has No Evidence To Establish Pretext. ................................................ 23

CONCLUSION ................................................................................................................ 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abdelsayed v. NYC Dep't of Educ.*,
   No. 16-CV-1775, 2019 WL 13271813 (E.D.N.Y. Mar. 12, 2019)........................................25

*Abdu-Brisson v. Delta Air Lines, Inc.*,
   239 F.3d 456 (2d Cir. 2001)....................................................................................................15

*Balogun v. N.Y. State Div. of Hum. Rts.*,
   No. 22-2756, 2023 WL 8446743 (2d Cir. Dec. 6, 2023)..............................................15, 19, 23

*Bjorklund v. Golub Corp.*,
   832 F. App'x 97 (2d Cir. 2021) ........................................................................................16, 23

*Brown v. Eli Lilly & Co.*,
   654 F.3d 347 (2d Cir. 2011)....................................................................................................15

*Butler v. St. Stanislaus Kostka Cath. Acad.*,
   609 F. Supp. 3d 184 (E.D.N.Y. 2022), *appeal dismissed*, No. 22-1623 (2d Cir.
   Aug. 26, 2022) ........................................................................................................................16

*Cardwell v. Davis Polk & Wardwell LLP*,
   No. 19-cv-10256, 2020 WL 6274826 (S.D.N.Y. Oct. 24, 2020)..............................................19

*Delaney v. Bank of Am. Corp.*,
   766 F.3d 163 (2d Cir. 2014).....................................................................................................23

*Devany v. United Parcel Serv., Inc.*,
   No. 18 Civ. 6684, 2021 WL 4481911 (S.D.N.Y. Sept. 30, 2021) ...........................................15

*Est. of Airday v. City of N.Y.*,
   No. 22-1081-CV, 2023 WL 4571967 (2d Cir. July 18, 2023)..................................................20

*Fried v. LVI Servs., Inc.*,
   No. 10-CV-9308, 2011 WL 4633985 (S.D.N.Y. Oct. 4, 2011), *aff'd*, 500 F.
   App'x 39 (2012) ......................................................................................................................19

*Gerzhgorin v. Selfhelp Cmty. Servs., Inc.*,
   No. 18-cv-04344, 2021 WL 8013836 (E.D.N.Y. Mar. 2, 2021), *R. & R.
   adopted*, 2022 WL 912523 (Mar. 29, 2022), *aff'd*, No. 22-808, 2023 WL
   2469824 (2d Cir. Mar. 13, 2023) ............................................................................................24

*Gorzynski v. JetBlue Airways Corp.*,
   596 F.3d 93 (2d Cir. 2010).................................................................................................16, 17

*Hamilton v. DeGennaro*,
No. 17-CV-7170, 2019 WL 6307200 (S.D.N.Y. Nov. 25, 2019)............................................20

*Henry v. McDonald*,
531 F. Supp. 3d 573 (E.D.N.Y. 2021) ..............................................................................17, 21

*Hicks v. Baines*,
593 F.3d 159 (2d Cir. 2010)....................................................................................................15

*Howard v. Consol. Edison Co. of N.Y., Inc.*,
No. 22-1706, 2023 WL 8270808 (2d Cir. Nov. 30, 2023) ......................................................16

*Lopez v. N.Y. City Dep't of Educ.*,
No. 17-CV-9205, 2020 WL 4340947 (S.D.N.Y. July 28, 2020)..............................................24

*Macshane v. City of N.Y.*,
No. 05-CV-06021, 2015 WL 1298423 (E.D.N.Y. Mar. 23, 2015), *aff'd sub
nom. Herlihy v. City of N.Y.*, 654 F. App'x 40 (2d Cir. 2016)................................................24

*Marseille v. Mount Sinai Health Sys., Inc.*,
No. 18-CV-12136, 2021 WL 3475620 (S.D.N.Y. Aug. 5, 2021), *aff'd sub
nom. Marseille v. Mount Sinai Hosp.*, No. 21-2140, 2022 WL 14700981 (2d
Cir. Oct. 26, 2022) ..................................................................................................................19

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973).................................................................................................................16

*Meyer v. State of N.Y. Off. of Mental Health*,
174 F. Supp. 3d 673 (E.D.N.Y. 2016), *aff'd sub nom. Meyer v. N.Y. State Off.
of Mental Health*, 679 F. App'x 89 (2d Cir. 2017)................................................................17

*Reeves v. Sanderson Plumbing Prods.*,
530 U.S. 133 (2000).................................................................................................................16

*Russo v. Patchogue-Medford Sch. Dist.*,
No. 22-CV-01569, 2024 WL 149131 (E.D.N.Y. Jan. 12, 2024) (Gonzalez, J.),
*appeal filed*, No. 24-378 (2d Cir. Feb. 14, 2024)....................................................................15

*Smalls v. Allstate Ins. Co.*,
396 F. Supp. 2d 364 (S.D.N.Y. 2005)................................................................................17, 21

*Spires v. MetLife Grp., Inc.*,
No. 21-2014, 2023 WL 545350 (2d Cir. Jan. 27, 2023) .........................................................23

*Summit v. Equinox Holdings, Inc.*,
No. 20-CV-4905, 2022 WL 2872273 (S.D.N.Y. July 21, 2022).............................................16

*Thomas v. Genova*,
--- F. Supp. 3d ----, No. 11-CV-6084, 2023 WL 6385800 (E.D.N.Y. Sept. 29, 2023) (Gonzalez, J.), *appeal filed*, No. 23-7452 (2d Cir. Oct. 23, 2023) ...............................15

*Townsend v. First Student*,
No. 21-2901-CV, 2023 WL 1807719 (2d Cir. Feb. 8, 2023) ..................................................16

*Willford v. United Airlines, Inc.*,
No. 21-2483, 2023 WL 309787 (2d Cir. Jan. 19, 2023) ........................................................23

## INTRODUCTION[1]

Plaintiff Joan Harvey, a former Delta flight attendant, was terminated after Delta determined—based on eyewitness accounts and a thorough investigation—that she violated critical safety policy by consuming alcohol within eight hours of her report time for a Trans-Atlantic flight from Ghana to New York and, critically, that she lied to Delta several times about the incident.  Specifically, Plaintiff told a series of shifting and inconsistent stories about the events related to her safety violation, which Delta determined were not credible and were inconsistent with objective evidence it obtained through its independent investigation.  Without any evidentiary support, Plaintiff now claims that a dozen or more Delta employees—including a captain, a fellow senior flight attendant, several human resource managers, unknown members of Delta's Substance Testing Team, and other senior leaders, many of whom have never met Plaintiff—conspired together to manufacture a reason to terminate Plaintiff's employment out of sheer discriminatory animus.  Plaintiff asks this Court to conclude that she actually was terminated because of her race and her age, and not because Delta determined, having considered all the evidence, that she had consumed alcohol shortly before she was required to report for duty in a safety sensitive position and that she had been untruthful with Delta during its investigation.  Plaintiff's claims rely on precisely the type of syllogistic reasoning (based solely on her membership in protected classes), speculation, and surmise that countless courts have rejected and found legally insufficient for claims to withstand summary judgment.

In contrast to her illogical conjecture, Delta has produced overwhelming evidence demonstrating that Plaintiff was terminated solely because Delta determined that she violated a

---

[1] All abbreviations and defined terms herein have the same meaning as in Delta's Local Rule 56.1 Statement of Undisputed Material Facts submitted with this motion ("56.1").  All exhibit citations herein are to exhibits attached to the Declaration of Michael F. Fleming in Support of Delta's Motion for Summary Judgment ("Fleming Decl."), sworn to on March 14, 2024.

critical safety policy and lied about it.  The record is replete with evidence supporting this basis for termination, including the consistent reports of eyewitnesses who had absolutely no reason to lie, which were corroborated by the independent investigation of Delta's managers, and which stood in stark contrast to Plaintiff's constantly changing narrative about the events that led to her termination.  The Court need not and, consistent with binding authority should not, sit as a super-personnel department, re-evaluate Delta's legitimate, non-discriminatory rationale, and determine *de novo* whether it believes Plaintiff was drinking alcohol  in violation of Delta's safety policies. Plaintiff can present no evidence demonstrating Delta's reasons for terminating her as false **and** that the true reason was discriminatory, and, therefore, she cannot satisfy her burden at the summary judgment stage.  Plaintiff's claims of race- and age-based discrimination, brought under 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and the New York State Human Rights Law ("NYSHRL"), fail as a matter of fact and law, and summary judgment should be granted to Delta.

## RELEVANT FACTUAL BACKGROUND

### A.    Delta Hired Plaintiff for a Safety-Sensitive Position.

Delta hired Plaintiff as a flight attendant in 1991, employing her for over 30 years and promoting her to the position of Purser (a senior flight attendant) when she was 51 years old.  (56.1 ¶¶ 14-15.)  Nothing is more important to Delta than safety.  (*Id.* ¶¶ 1-9, 12-13.)  A Delta's flight attendant's primary responsibility is to ensure the safe passage of all Delta's passengers and crew. (*Id.* ¶ 2.)  In an emergency situation, flight attendants are the first responders on the aircraft, and may be required to perform critical tasks such as operating fire extinguishing equipment, opening emergency exits, deploying and inflating emergency slides, and assisting ill and injured passengers, including by using first aid techniques such as CPR and AED.  (*Id.* ¶ 4.)

In order to meet its commitment to carry its passengers and crew safely to destinations

around the world, Delta maintains a number of important policies and procedures that are designed to protect the health and well-being of its passengers, its crewmembers, and its aircraft. (*Id.* ¶ 5.) One such policy is the Alcohol Policy and Alcohol Misuse Prevention Program (the "Alcohol Policy"). (*Id.* ¶ 6.) Among other restrictions, Delta's Alcohol Policy prohibits crew members (including flight attendants) from consuming **<u>any</u>** alcohol within eight (8) hours of the time the crew member is required to report for duty (the "Pre-Duty Use Prohibition"). (*Id.* ¶¶ 6-9.) Because the Pre-Duty Use Prohibition is absolute (i.e., *no* amount of alcohol may be consumed pre-duty), Delta's Alcohol Policy does not require alcohol testing of a flight attendant who is suspected of violating the policy. (*Id.* ¶ 9.) Delta's Alcohol Policy also expressly warns that "[e]ven such products as 'non-alcoholic' beer can contain alcohol." (*Id.* ¶ 6; Ex. G, p. 3.) Employees who violate the Alcohol Policy are subject to discipline, including, but not limited to, termination. (56.1 ¶ 7.)

Plaintiff—as a senior member of the flight crew, whom Delta had promoted and invested a significant amount of time and training resources over a number of years—was expected to know these policies by heart and comply with them at all times. (*Id.* ¶ 5.) Further, employees who are aware of potential violations of the Alcohol Policy (or any other policy that implicates safety) are obligated to report those violations to Delta. (*Id.* ¶ 13.) Violations of the Pre-Duty Use Prohibition are considered extremely serious and are, thankfully, exceedingly rare. (*Id.* ¶ 99.) In the last five years, only two New York-based flight attendants were found to have violated the policy. (*Id.*) One of those flight attendants was Plaintiff and the other was a much younger employee who did not identify as Black. (*Id.* ¶ 100.) Both were terminated. (*Id.*)

On October 18, 2021, Plaintiff was scheduled to work a Trans-Atlantic Delta flight from Kotoka International Airport in Accra, Ghana to John F. Kennedy International Airport in New

York, New York.  (*Id.* ¶ 17.)  The flight crew were required to report for duty at 8:30 p.m. GMT.

(*Id.* ¶ 18.)  Approximately four or five hours before that time, between approximately 3:30 p.m.

and 4:30 p.m. GMT (i.e., between four and five hours of the flight crews' report time), Delta

Captain Pete Corrao and Flight Attendant Lauren Harps both observed Plaintiff sitting alone at a

table in the bar area of the pool ("Pool Bar") of the hotel.  (*Id.* ¶¶ 19-28.)  Captain Corrao and Ms.

Harps were scheduled to work the same flight back to New York as Plaintiff.  (*Id.* ¶ 20.)  Neither

had worked with Plaintiff before the trip to Accra.  (*Id.* ¶¶ 21-22.)  Captain Corrao and Ms. Harps

both saw a drink on Plaintiff's table that they believed, based on its appearance, was a beer poured

into a glass.  (*Id.* ¶¶ 23-32; Corrao Tr. 15:18-20 ("Q. Did the beverage look like a beer? A. Yes.");

Harps Tr. 31:8-20 ("Q. Did the beverage look like a beer? A. Yes. Q. Can you tell me what is

obvious about it; is it the color, is it the smell? A. I mean all of those things but from afar, yeah,

the color, the bubbles[.]"); *see also* Pl. Tr. 69:3-5 (describing the beverage as "carbonated,"

"thick," and "could look like a Guinness"), 70:8-11 (testifying that the beverage was served in a

"goblet").)  Captain Corrao saw Plaintiff physically drink about half of the beverage, and Ms.

Harps observed that about half the beverage had been consumed.  (56.1 ¶¶ 25-26.)  Neither saw

anyone sitting with Plaintiff at any time while they were at the pool.  (*Id.* ¶ 28.)

Out of concern for the safety of his passengers and flight crew and consistent with his

reporting obligations to Delta, Captain Corrao approached Plaintiff, confirmed she was planning

to work the flight that evening, and then asked why she was drinking a beer.  (*Id.* ¶ 29.)  Captain

Corrao reported to Delta that, in response to his questions, Plaintiff confirmed she was working

the flight later that night, claimed that she was not "drinking," but had only had "a few sips."  (*Id.*

¶¶ 35, 37-38.)  Captain Corrao further reported to Delta that Plaintiff did not deny the beverage

was a beer and expressed confusion about whether the Pre-Duty Use Prohibition applied four or

eight hours before report time.  (*Id.* ¶¶ 38-40.)  Captain Corrao did not make any comments about Plaintiff's race or her age during this conversation.  (*Id.* ¶ 30.)  Based on his observations and discussion with the Plaintiff, Captain Corrao believed that Plaintiff had violated the Pre-Duty Use Prohibition and that he had an obligation to report that violation to Delta to protect the safety of the Delta passengers and crewmembers he was responsible for flying across the ocean that evening.  (*Id.* ¶ 31.)  Ms. Harps formed the same belief based on what she observed.  (*Id.* ¶ 32.)

At approximately 5:15 p.m. GMT, Captain Corrao and Judieth Passman (the Purser for the return flight) called New York Base Director David Gilmartin.  (*Id.* ¶ 35.)  During the call, Captain Corrao reported to Mr. Gilmartin what he and Ms. Harps had observed at the Pool Bar and about his conversation with Plaintiff about the same.  (*Id.* ¶¶ 35-40.)  Mr. Gilmartin asked Captain Corrao if the beverage could have been a non-alcoholic beer, and Captain Corrao responded that the hotel did not serve non-alcoholic beer and that Plaintiff had not denied she was drinking a beer when he spoke with her.[2]  (*Id.* ¶ 39.)  After speaking with Captain Corrao and Ms. Passman, Mr. Gilmartin contacted the Operational Customer Center ("OCC") and informed OCC Manager Pedro Ramos about the report he had received regarding Plaintiff drinking in Accra.[3]  (*Id.* ¶ 41.)  Mr. Ramos

---

[2] Ms. Passman also shared with Mr. Gilmartin that Plaintiff appeared to have been "overserved" the night before when Ms. Passman saw her in the hotel lobby.  (Ex. H, p. Delta 001086.)  Ms. Harps testified that Plaintiff also had appeared intoxicated at a restaurant where the crew ate dinner that evening.  (Harps Tr. 11:1-18.)  Plaintiff disputes that she was drunk that evening, but claims she stumbled on her way out of the restaurant and injured her ankle.  (56.1 ¶ 47.)  Plaintiff did not report this injury to Delta until after she was notified about suspected policy violation.  (*Id.* ¶ 48.)
[3] At around the same time, Plaintiff called Ms. Passman, purportedly to report that she had injured her ankle the night before and intended to "call off" the trip to New York.  (*Id.* ¶¶ 47-48.)  Plaintiff does not dispute that Delta's On-The-Job Injury Policy required her to report her injury to Delta immediately (Pl. Tr. 55:3-9), and she admits that the first time she communicated with Delta about the purported injury was when she called Ms. Passman after she spoke with Captain Corrao and Ms. Harps at the Pool (56.1 ¶ 48).  Much like the shifting stories she has told about what happened at the Pool Bar, Plaintiff offered a number of excuses for why she did not communicate with Delta about her purported injury ***before*** she was suspected of violating the Pre-Duty Use Prohibition, including that it was "late at night," (*id.* 54:11-21); that she did not want to pay for an international

then contacted Delta's Substance Testing Team, who advised that Plaintiff should not report to the airport for testing—Delta does not have the capacity to test for alcohol at the Accra airport—but she should be removed from the flight due to safety.  (*Id.* ¶¶ 42-43.)

Mr. Gilmartin and Mr. Ramos then called Plaintiff and advised her that she was being removed from the flight for a suspected violation of the Pre-Duty Use Prohibition.  (*Id.* ¶¶ 50-51.) Mr. Gilmartin's contemporaneous notes of the call with Plaintiff reflect that Plaintiff claimed the beer on her table belonged to a friend, and, when asked to identify the friend, stated only that "it was somebody from the outside who lives in Accra."  (Ex. J, pp. Delta 000154–Delta 000155.) When Mr. Gilmartin told Plaintiff she was to "deadhead" (i.e., fly in a non-working capacity) back to New York the following day, Plaintiff claimed that she had hurt her ankle the night before and requested permission to stay in Accra for an additional day so that she could seek medical treatment.  (*Id.*)  Mr. Gilmartin approved Plaintiff's request.[4]  (*Id.*)

Mr. Gilmartin asked Plaintiff to submit a written statement about the incident to Flight Services Manager ("FSM") Kris Sooknanan, who was Plaintiff's direct manager, and further instructed Plaintiff not to speak with anyone else about the incident.  (*Id.*)  Mr. Gilmartin and Mr. Ramos did not make any comments about Plaintiff's race or her age during this conversation.  (*Id.* ¶ 54.)  Mr. Gilmartin also asked Captain Corrao, Ms. Passman, and Ms. Harps to submit written statements about the incident and instructed each to keep the matter confidential.  (*Id.* ¶¶ 55-60.)

---

call on the hotel room phone, although the Delta number was toll-free (*id.* at 60:6-17, 61:21-25); that she tried to call the Purser and Captain Corrao in their rooms but they did not answer (*id.* at 61:2-20), that she tried to call Delta scheduling from her cell phone but could not get through (*id.* at 62:3-9); that she asked to use a friend's phone, but her friend did not have service (*id.* at 64:5-14), that she was not allowed to use the front desk phone (*id.* at 64:15-20); and that she left her cellphone in her hotel room (*id.* at 67:2-6).  Despite repeated requests by Delta, Plaintiff never produced any records of her purported attempts to contact anyone about her alleged ankle injury.
[4] Plaintiff testified that Mr. Gilmartin may have cautioned her against reporting to the airport because she might be arrested by for drinking by the transit authority.  (Pl. Tr. 81:9-11.)

Each witness separately submitted statements to Mr. Gilmartin to review.  (*See* Ex. H.)

In his statement, Captain Corrao reported that he had observed Plaintiff drinking out of a "Stella Chalice" and that he did not know Plaintiff was a member of the flight crew until Ms. Harps identified her.  (*Id.*, at p. Delta 000157.)  Captain Corrao further stated that, when he approached Plaintiff, he asked her to identify herself and confirm she was working the flight that evening. (*Id.*) Captain Corrao's statement to Delta reflects that, after Plaintiff confirmed she was planning to work the return flight to New York, Captain Corrao asked her why she was drinking a beer, and she responded that she had only had "a few sips." (*Id.*)  Captain Corrao also reported that he saw Plaintiff consume over half the chalice, and that, she was confused about whether the prohibition applied four or eight hours before report time.  (*Id.*)

Consistent with Captain Corrao's statements, Ms. Harps confirmed in her statement that she and Captain Corrao had observed Plaintiff at the Pool Bar with a beverage they believed was a beer.  (*Id.*, pp. Delta 000159-Delta 000160)  Ms. Harps also informed Delta that, after Captain Corrao left the pool to speak with Ms. Passman, Plaintiff approached her and seemed confused about the time and the requirements of the Alcohol Policy.[5]  (*Id.*)  In her statement, Ms. Passman reported that Plaintiff told her that she only was drinking a beer because she had intended to "call off the trip" because of an injury.  (*Id.*, p. Delta 001086.)  Neither Captain Corrao, Ms. Harps, nor Ms. Passman had ever worked with Plaintiff before the Accra trip.  (56.1 ¶¶ 21-22; *see also* Pl. Tr. 98:21–99:4 ("So you see the white people out there [in Accra] because it's mostly black people. . . . When the girl [Ms. Harps] said hi, he [Captain Corrao] identified me through her.  He didn't

---

[5] Captain Corrao confirmed in a supplemental statement that he actually saw Plaintiff pick up and drink the beer.  (Ex. H, p. Delta 000157.)  Ms. Harps, who arrived at the pool after Captain Corrao, later clarified that, while she did not see Plaintiff physically pick up and drink the beer, she did see a half full glass of beer on Plaintiff's table and did not see anyone else at the table while she was at the pool.  (*Id.*, pp. Delta 000159-Delta 000160.)

know me before that.  That man didn't know me from Adam.").)

The following day, October 22, 2022, Plaintiff submitted her first written statement about the incident, which not only differed from the consistent version of events reported to Delta by Captain Corrao, Ms. Passman, and Ms. Harps, but also was inconsistent with the prior statements Plaintiff had made to Mr. Gilmartin and Mr. Ramos:

> I was on my layover [o]n the 20 oct. about 1:30 local time in [G]hana.  I was having lunch outside near the pool area.  White man approached me.  He started by asking me my name then .. which I replied …he said to me why are [yo]u drinking a when [yo]u are flying back on the flight tonight.  I replied sir I am not drinking .. he then said I saw [yo]u have a beer.  I said once again I have a nonalcoholic drink.  He became very aggressive and belligerent toward me .. and stated he was going to call the purser and let delta know what he saw .. I then tired [sic] to tell him again I was not drinking.. his accusations and harassment because very loud and I became very nervous of what he was accusing me of.  My friend ..I tired [sic] to explain to him that my injury to my ankle did not warrant me to fly back.  He kept saying I was drinking . . . I was not in uniform[].  I was not on the aircraft.  I was outside with others around me.[6]

(56.1 ¶ 61; Ex. I, p. Delta 000156.)

### B.    Delta Thoroughly Investigated and Concluded, Based on All Available Evidence, that Plaintiff Violated the Pre-Duty Use Prohibition.

On October 22, 2021, Plaintiff flew back to New York and met with FSM Shannon Kelly and Mr. Gilmartin.  (*Id.* ¶ 62; Ex. J, pp. Delta 000151–Delta 000152.)  Mr. Gilmartin asked Plaintiff again about the incident at the Pool Bar and, based on her responses, determined that her story had changed in the two days since they last spoke.  (*Id.*)    According to Mr. Gilmartin's contemporaneous notes, during the meeting, Plaintiff claimed she had been drinking a non-alcoholic cider and that the beer belonged to a male friend named "Ebenezer."  (*Id.*)  At the meeting, Mr. Gilmartin informed Plaintiff she was being suspended without pay.  (56.1 ¶ 66.)  Mr. Gilmartin did not make any comments about Plaintiff's race or age during the meeting.  (*Id.* ¶ 67.)

---

[6] Notably, the Pre-Duty Use Prohibition applies regardless of whether a crewmember is in uniform or on the aircraft.  (56.1 ¶ 8; Ex. G, p. 4.)

After the suspension meeting, Mr. Gilmartin and Mr. Sooknanan continued to investigate the incident at the Pool Bar. (*Id.* ¶¶ 68-72.) As part of that investigation, they re-reviewed the witnesses' and Plaintiff's statements. (*Id.*) They also reviewed two documents that Plaintiff submitted as purported evidence that she had not consumed any alcohol in the hours leading up to the flight to New York: (1) a photograph of an invoice from the hotel and (2) a photograph of a written statement from an individual who claimed to be the waiter who had served Plaintiff at the Pool Bar. (*Id.*; Ex. K.) While the invoice appeared to show that Plaintiff was charged for a "Dinner Bev Non Alc" from the hotel's Galley Bar on October 19 and again on October 20[7], the invoice only reflected that Plaintiff was charged for "lunch food" from the Pool Bar on October 20. (Ex. K, p. Delta 000153.) In other words, the invoice was, at best, inconclusive as to what Plaintiff ordered at the Pool Bar on the afternoon of October 20. (*Id.*)

The "waiter's statement" alleged that Plaintiff ordered a "cider (Friels Cider)" at the Pool Bar. (*Id.*, p. Delta 000551.) It appears that someone inserted the words "1:30 p.m." and "non-alcoholic" to the statement after it was drafted. (*Id.*) As part of his independent investigation, Mr. Gilmartin obtained a copy of the bar menu from the hotel, which he compared to the "waiter's statement." (56.1 ¶ 70.) Mr. Gilmartin determined upon review of the menu that there was not a non-alcoholic cider offered and the only cider listed was "Friels Vintage Cider," which was included in the bottled beers section of the menu along with Stella Artois (i.e., the same glass Captain Corrao observed Plaintiff drink from).[8] (*Id.* ¶¶ 70-73; Ex. K.) Mr. Gilmartin believed that the "waiter's statement" was inconsistent with prior statements made by Plaintiff, including her

---

[7] Curiously, the October 20 entry is a negative charge of -$3.00 GHS for this order. (Ex. K, p. Delta 000153.)
[8] Publicly available information indicates that Friels Vintage Cider has an alcohol level of 7.5%. *See* https://frielscider.co.uk/our-ciders/first-press-vintage/ (last visited March 13, 2024).

-9-

comment to Captain Corrao that she had only had "a few sips," and the fact that she had not initially claimed she was having a "cider," along her confusion about the timing of the Pre-Duty Use Prohibition. (56.1 ¶¶ 70-79.) Based on their review of these documents, Mr. Gilmartin and FSM Sooknanan both concluded that Plaintiff had violated the Pre-Duty Use Prohibition and had not been candid with Delta during the investigation of the incident. (*Id.* ¶¶ 72-74.) Accordingly, they recommended to Senior Base Manager Carla Bourdier that Plaintiff's employment be terminated. (*Id.*, ¶ 74.) On October 26, 2021, Ms. Bourdier concurred with this recommendation. (*Id.*)

On October 27, 2021, Plaintiff submitted her second written statement to Delta, which was addressed to Human Resources Manager Emily Pardo, who covered In-Flight Services ("IFS") employees (including flight attendants) based in New York. (*Id.* ¶¶ 75-76; Ex. I, pp. P00038-P00041.) Plaintiff's second written statement stated, in relevant part:

> **I dined with an old friend at the pool area. I had a full meal of chicken and rice with my friend. We ordered a cider. He sat with me for approximately 30-40 minutes then departed. The flies were crazy so I moved to another table**. . . . a man (who I now know was our acting captain) approached me asking why I was drinking beer and if I was flying tonight. He also reminded me that it was close to report time and that I am not suppose [sic] to be drinking beer. This man did not identify himself to me. He accused me of drinking beer I immediately responded, " Sir I am not drinking beer and not flying back tonight because of an injury." He proceeds....." I saw you drinking beer and I am going to tell the purser and Delta!"

(*Id.* (emphasis added).)

On October 28, 2021, Ms. Pardo prepared her own recommendation for termination, which was reviewed and approved by HR General Manager Terrence Jackson. (56.1 ¶ 77; Ex. L, p. Delta 000144.) There are no specific allegations that any of these individuals considered or were even aware of Plaintiff's race or age in making their decision. On November 17, 2021, while Plaintiff remained on suspension, but prior to her being notified of her termination, Delta received a letter from an attorney who represented Plaintiff. (56.1 ¶ 78; Ex. I, pp. Delta 000246-Delta 000248.) This letter – Plaintiff's third written account of the events in Accra – provided yet another version

-10-

of the events at the Hotel Kempinski pool bar:

> **Ms. Harvey's next course of action was to take Motrin but didn't want to do so on an empty stomach. To that end, she sat by the pool and ordered chicken, rice and a non-alcoholic apple cider.** While eating by the pool, Ms. Harvey also tried to contact Delta several times in order to call in sick and not fly back later that evening. Unfortunately, the internet by the pool was spotty at best and her calls kept dropping. She decided to finish her lunch and then return to her room where the internet connection may be better in order to contact Delta.

(*Id.*)  As HR Manger Pardo observed at the time, the lawyer letter made "no mention" of Plaintiff's "local friend who she claimed the 'beer' belonged to at times," "her confusion about the 8-hour rule," and, contrary to Captain Corrao's report, Plaintiff claimed through her lawyer that she told the captain that she was not drinking alcohol.  (56.1 ¶ 79; Ex. M.)

After receiving the lawyer letter and its new version of events as alleged by Plaintiff, Ms. Pardo asked Mr. Gilmartin to call the Kempinski Hotel and obtain further information about the beverage offerings. (56.1 ¶ 81.)  Mr. Gilmartin spoke with the front desk manager and a bartender at the hotel, both of whom told him (consistent with the menu he already had obtained) that the hotel does not serve non-alcoholic cider and only serves alcoholic cider.  (*Id.*, ¶ 82.)  At that point Mr. Gilmartin, Ms. Pardo, and Mr. Jackson all agreed that Plaintiff had not been candid during the course of the investigation, and they reaffirmed the termination decision.  (*Id.*  ¶¶ 79-87.)

On December 6, 2021, Mr. Sooknanan and IFS Northeast Region Director Andrea Misserian flew to Atlanta to meet with Plaintiff and inform her of her termination.  (*Id.* ¶ 85.)  Regional Director Misserian was the senior most director in the region and, per Delta policy, attended the termination meeting as a sign of respect for Plaintiff's years of service.  (*Id.* ¶ 86.)  The basis for Plaintiff's termination was her violation of Delta's Pre-Duty Use Prohibition and her lack of candor during the investigation into that violation.  (*Id.* ¶ 87.)  During the meeting, no one made any comments about Plaintiff's race or her age.  (*Id.* ¶ 88.)

### C.      Plaintiff's Story Changed Several More Times Following Her Termination.

On December 30, 2021, Plaintiff submitted a fourth written statement to Human Resources

Director Robert Heillmann, that stated, in part:

> On October 20, 2021, I was on a layover in Accra. While sitting at the pool area
> grill, I was approached by a Delta pilot by the name of Peter. I placed an order at
> the grill which included chicken and rice, and a malt cider. **A friend of mine from
> Accra came to visit me and he ordered a beer but left the hotel before 2pm
> because of the traffic. I moved to another table due to the flies at my original
> seating area, and the waiter assisted by moving my beverage and my friend's
> beverage to table. The waiter wasn't aware that my friend had left the hotel.**

(*Id.* ¶ 89; Ex. I, p. Delta 000364-Delta 000365 (emphasis added).)   On January 7, 2022, Mr.

Heillmann left a voicemail for Plaintiff stating that Delta's Equal Opportunity ("EO") Office

would conduct an independent review of Plaintiff's termination.   (*Id.* ¶¶ 90-91; Ex. I, p. Delta

000363.)

Delta EO Manager James Brimberry was assigned to review the termination.   (*Id.* ¶ 92.)

As part of that review, Mr. Brimberry reviewed all of the documents that had been collected as

part of the initial investigation and, after several attempts to contact Plaintiff, also spoke with her

on February 23, 2022.  (*Id.* ¶¶ 93-98; Ex. N, pp. Delta 000911-Delta 000914.)  On or around March

1, 2022, Mr. Brimberry also reviewed a statement – the fifth such written statement submitted by

Plaintiff – purported prepared by a woman named Helen Samson David, whom Plaintiff later

admitted to paying $35 to travel to an internet bar in Ghana and submit a statement regarding the

incident at the Pool Bar.[9]  (*Id.* ¶¶ 94-55; Ex. N, p. Delta 000456.)

Helen Samson David's retelling of the incident differs from all of Plaintiff's prior accounts:

> Dear sir/madam I'm writing this letter in reference to miss Harvey, a member of
> Delta airline cabin crew. I want to use this opportunity to say she has been a great

---

[9] Plaintiff has never produced any record of this payment to Ms. Sampson David, despite Delta
having requested it and Plaintiff having testified that she had a record of the "mobile money"
payment.  (Pl. Tr. 223:15-22.)  Plaintiff also testified that sending "$25 to [Ms. Sampson David]
is like $300."  (*Id.* at 221:23– 222:9.)

friend and will also say a great flight attendant, I have known her for [a] while now, she has always spoke highly of her job and has been very happy and proud to work for Delta. [W]e where [sic] together on the 20th of October **We both shared lunch at the pool grill side, inside the Kempinski hotel Ghana. I ordered rice, chicken and coke while miss Joan had only rice and malt.** I want to use this medium to humbly plead on her behalf to be recalled as a delta cabin crew which will be very much appreciated, thank you for your cooperation we look forward to a positive reply from you.

(Ex. I, p. Delta 000456 (emphasis added).)

On March 1, 2022, Plaintiff submitted to Mr. Brimberry a sixth written statement with a

new story about the incident at the Pool Bar, which read, in part:

On oct 18 I was on my assignment rotation 1051 Jfk to acc. I worked as the service leader.. we landed on October 19 2021. On October 19 while trying to get dinner in acc I took a Uber driver to get food. It had started to rain. As I was walking to the car. I slipped and sprain my ankle pretty badly. The driver took me back to the hotel. Because I had ask the driver if he could return the next day to talk me to get some meds or a wrap for my ankle he returned to the hotel the Kempinski to assist me. **I offered him lunch because he said he was hungry. We went to the pool restaurant. We sat inside. But because he had a ride later after eating he left. I moved out side [sic] around the pool area. The waiter that had serve[d] us brought my drink outside. But he didn't realize that my friend the Uber driver had left. So he brought my chicken and left over outside. He also brought the left over beer that my friend had left behind out to my new sitting table ... but as I sat outside the waiter started getting busy with others. When he came back to my table .. a fly has [sic] gotten in to the left over beer that my friend had left behind. So the waiter came back with a small glass that looked like the cider that I was drinking. He place it on the table.**

(56.1 ¶ 97; Ex. I, p. Delta 000925 (emphasis added).)

Based on Mr. Brimberry's review of the information Plaintiff submitted and the

circumstances surrounding her termination, Delta denied Plaintiff's appeal of her termination on

April 12, 2022. (56.1 ¶ 98.) By the time the appeal was denied, Plaintiff had told nearly a dozen

versions of the Pool Bar incident; she has claimed: (1) she drank the beer, but only "a few sips;"

(2) that she had drank the beer because she intended to call off' the trip; (3) that the beer was

ordered by "somebody from the outside who lives in Accra;" (4) that the beer was ordered by a

man named Ebenezer; (5) that the beer was ordered by a man named Mike, who had been her Uber

driver and dinner companion the night before; (6) that the beverage was a coke that was ordered by a woman named Helen Samson David; (7) that a waiter had mistakenly brought the beer to her table; (8) that a fly had landed in the beer and a waiter had brought a new beer in the exact same type of glass from which Plaintiff was having a non-alcoholic drink; (9) that the non-alcoholic drink was a cider, a malt, or a malt cider.  (*Id.* ¶¶ 38, 53, 55, 61, 64, 76, 78, 89, 95, 97.)

Plaintiff has never suggested a rationale as to why Captain Carrao or Ms. Harps, neither of whom knew Plaintiff, would lie about seeing her with a beverage resembling a beer at the Pool Bar, or why Ms. Passman, who also did not know Plaintiff, separately would fabricate a conversation that she had with Plaintiff while in Accra (during which Plaintiff admitted to drinking a beer because she planned to "call of" the trip).  (*Id.* ¶ 55.)  Plaintiff has never demonstrated that a non-alcoholic cider had even been available at the hotel; however, she has at various times expressed confusion about the Delta Alcohol Policy, she has also stated that she thought she was permitted to drink because she claims she did not plan to return to New York that evening due to her alleged ankle injury, while admitting that she did not notify Delta of this alleged plan before she was suspected of violating the Pre-Duty Use Prohibition.  (*Id.* ¶¶ 47-48, 55.)

Given all of this information, Delta determined that Plaintiff's ever shifting story lacked credibility, in stark contrast to the eye-witness accounts from Captain Corrao and Ms. Harps, along with the consistent reports from Ms. Passman, Mr. Gilmartin, and Mr. Sooknanan, none of whom is alleged to have had any reason to lie or wish harm upon Plaintiff.  (*Id.* ¶¶ 73, 77, 79, 87, 98.)

## **ARGUMENT**

### I.   **STANDARD OF REVIEW.**

A party is entitled to summary judgment where it can show that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  So established, a party opposing summary judgment "may not rely on mere speculation or

conjecture as to the true nature of the facts to overcome a motion for summary judgment" and "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted). "'Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with **specific evidence** demonstrating the existence of a genuine dispute of material fact.'" *Russo v. Patchogue-Medford Sch. Dist.*, No. 22-CV-01569, 2024 WL 149131, at *3 (E.D.N.Y. Jan. 12, 2024) (Gonzalez, J.), *appeal filed*, No. 24-378 (2d Cir. Feb. 14, 2024) (emphasis added) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). "The **mere existence of a scintilla of evidence in support** of the non-movant will not alone defeat a summary judgment motion." *Thomas v. Genova*, --- F. Supp. 3d ----, No. 11-CV-6084, 2023 WL 6385800, at *5 (E.D.N.Y. Sept. 29, 2023) (Gonzalez, J.), *appeal filed*, No. 23-7452 (2d Cir. Oct. 23, 2023) (emphasis added; citation omitted).

The "salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases" than to other areas of litigation. *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (citation omitted). "As in any other case, a plaintiff in a discrimination case 'must do more than simply show that there is some metaphysical doubt as to the material facts. [She] must come forth with evidence sufficient to allow a reasonable jury to find in [her] favor.'" *Devany v. United Parcel Serv., Inc.*, No. 18-6684, 2021 WL 4481911, at *8 (S.D.N.Y. Sept. 30, 2021) (citation omitted).

## II. PLAINTIFF CANNOT ESTABLISH A BASIS TO PROCEED ON ANY OF HER DISCRIMINATION CLAIMS.

Plaintiff's claims of race- and age-based discrimination under § 1981, Title VII, the ADEA, and the NYSHRL all are evaluated under the same burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Balogun*

*v. N.Y. State Div. of Hum. Rts.*, No. 22-2756, 2023 WL 8446743, at \*1 (2d Cir. Dec. 6, 2023) ("[C]laims of discrimination and retaliation under Title VII are evaluated under the familiar *McDonnell Douglas* burden-shifting framework."); *Howard v. Consol. Edison Co. of N.Y., Inc.*, No. 22-1706, 2023 WL 8270808, at \*1 (2d Cir. Nov. 30, 2023) (applying *McDonnell Douglas* framework to Section 1981 and NYSHRL claims); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (same for ADEA claims).  To proceed past summary judgment on any of her claims, Plaintiff first must establish a prima facie case of discrimination by presenting evidence that (i) she is a member of a protected class; (ii) she was qualified for the position she held; (iii) she suffered an adverse employment action; and (iv) a discriminatory motivation for the adverse action can be inferred by the Court.  *See Howard*, 2023 WL 8270808, at \*1.  If Plaintiff can establish her prima facie case (which she cannot), the burden shifts to Delta to present a 'legitimate, non-discriminatory explanation for the challenged employment action.  *Butler v. St. Stanislaus Kostka Cath. Acad.*, 609 F. Supp. 3d 184, 190 (E.D.N.Y. 2022), *appeal dismissed*, No. 22-1623 (2d Cir. Aug. 26, 2022).  Delta's "burden is 'one of production, not persuasion.'"  *Summit v. Equinox Holdings, Inc.*, No. 20-4905, 2022 WL 2872273, at \*6 (S.D.N.Y. July 21, 2022) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000)).

Because Delta can satisfy this burden, to survive summary judgment, Plaintiff must both establish her prima facie case *and* prove by a preponderance of the evidence that Delta's reasons are false **and** the true motivation for its actions was unlawful discrimination.  *See Bjorklund v. Golub Corp.*, 832 F. App'x 97, 98 (2d Cir. 2021) ("**[T]o 'get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination**.'" (emphasis added; citation omitted)); *Townsend v. First Student*, No. 21-2901, 2023 WL 1807719, at \*2 (2d Cir. Feb. 8, 2023) (granting summary judgment where

plaintiff failed to prove defendant's explanations were false, "**let alone a pretext for racial discrimination.**" (emphasis added)).  Further, with regard to Plaintiff's ADEA claim, to prevail, she "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor." *Gorzynski*, 596 F.3d at 106 (citation omitted).  Delta is entitled to summary judgment on Plaintiff's discrimination claims because (A) there is no evidence that gives rise to an inference of discrimination; (B) Delta had legitimate, non-discriminatory reasons for suspending and terminating Plaintiff's employment; and (C) Plaintiff has no evidence to rebut Delta's legitimate reasons, or to establish that discrimination was the actual reason for her suspension or termination.

### A.   Plaintiff Has No Evidence That Raises an Inference of Discrimination.

Plaintiff's subjective belief that she was discriminated against cannot give rise to an inference of discrimination.  *Henry v. McDonald*, 531 F. Supp. 3d 573, 586 (E.D.N.Y. 2021).  To satisfy her prima facie burden, Plaintiff must identify some objective evidence from which the Court could reasonably draw that inference.  *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("A plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn.") (citation omitted).  Here, Plaintiff's sworn testimony makes clear that she has no such objective evidence.  She concedes that no one made any discriminatory comments about her age or her race at any time.  (56.1 ¶¶ 30, 49, 54, 67, 88.)  She can offer no evidence to suggest (let alone prove) that any of the decisionmakers had any individual animus towards her, let alone animus based upon her race or age.[10]  Indeed, Delta supported and invested in Plaintiff throughout

---

[10] Notably, all of the individuals involved in the decisions to suspend and terminate Plaintiff's employment also were within one or more of the same protected classes (age and race) as Plaintiff.  (56.1 at ¶¶ 83-84.)  These facts give rise to an inference **against** discrimination.  *See Meyer v. State of N.Y. Off. of Mental Health*, 174 F. Supp. 3d 673, 687 (E.D.N.Y. 2016), *aff'd sub nom. Meyer v.*

her career which included her promotion to a Purser position and achievement of high-seniority and seniority related benefits. (*Id.* ¶¶ 15-16.) Rather than contend with these facts, Plaintiff relies on two faulty arguments to preserve her claim.

First, she argues that Delta did not suspend or terminate other flight attendants who were accused of violating Delta's Alcohol Policy. That speculative argument is demonstrably wrong. The record evidence establishes that Delta had only one other incident of a violation of the Pre-Duty Use Prohibition by a New York-based flight attendant, who was not Black, was much younger than Plaintiff, and also was terminated. (*Id.* ¶¶ 99-100.) Plaintiff's effort to equate her situation with other employees who violated a different section of Delta's Alcohol policy is legally unsound, as she cannot establish that those employees were similarly situated to her. (*See* Pt. II(A)(1) *infra*.) Even if she could rely on other, distinguishable circumstances to give rise to an inference of discrimination, Delta anticipates that Plaintiff will attempt to misconstrue the data in support of her argument, as it does not otherwise support her position. Delta trusts that the Court will not be swayed by manipulated statistics.

Plaintiff's second argument—that Delta was required to test her for alcohol consumption in Accra—fares no better. (*See* Pt. II(A)(2) *infra*.) Critically, it is undisputed that Delta does not perform any alcohol testing in Accra. (56.1 ¶ 43; Ex. G.) Accordingly, the lack of testing cannot logically be connected with Plaintiff's race or age. Moreover, as Delta's witnesses explained during their depositions, Delta policy does not require testing for alcohol if the suspected violation is of the Pre-Duty Use Prohibition, a zero-tolerance prohibition. (*Id.* ¶ 9; Ex. G.)

---

*N.Y. State Off. of Mental Health*, 679 F. App'x 89 (2d Cir. 2017) ("It is a well-settled, albeit not dispositive, principle that where the alleged discriminator is a member of the same protected class as Plaintiff, an inference against discrimination exists[.]").

At base, Plaintiff's discrimination claims rely solely on her membership in a protected class, which is insufficient, as a matter of law, to give rise to an inference of discrimination. *See, e.g.*, *Cardwell v. Davis Polk & Wardwell LLP*, No. 19-10256, 2020 WL 6274826, at *26 (S.D.N.Y. Oct. 24, 2020) ("The deficiency of Plaintiff's claims of discrimination . . . is resonant of the 'familiar faulty syllogism: something bad happened to me at work; I am (fill in the blank with one or more protected categories); therefore it must have happened because I am (fill in the blank with the applicable protected category).'" (citation omitted)).  Indeed, Plaintiff has not established that any of the decisionmakers—all of whom were also over 40—were aware of her age, let alone based their decision on animus toward her because of her age.  Plaintiff confirmed the only basis for her age-discrimination claim was that she was given the option to retire instead of being terminated.  (Pl. Tr. 180:20–181:25.)  "[C]ourts have consistently held that remarks relating to retirement or transition planning are insufficient to defeat a motion for summary judgment in an ADEA case." *Fried v. LVI Servs., Inc.*, No. 10-9308, 2011 WL 4633985, at *9 (S.D.N.Y. Oct. 4, 2011), *aff'd*, 500 F. App'x 39 (2012).  This Court should do the same.

### 1.  Plaintiff Cannot Identify A Similarly Situated Comparator Who Engaged in Comparable Conduct And Was Treated More Favorably.

The Second Circuit has articulated a clear standard for analyzing claims of discrimination based upon comparator evidence: "such comparators must be similarly situated '**in all material respects**'—they must be '**subject to the same performance evaluation and discipline standards**' as [Plaintiff] and must have **engaged in 'comparable conduct**.'" *Balogun*, 2023 WL 8446743, at *2 (emphasis added; citation omitted).  Plaintiff must present record evidence supporting the comparison; she cannot rely on "her own unilateral assumptions about how coworkers outside of her protected classes were treated." *Marseille v. Mount Sinai Health Sys., Inc.*, No. 18-12136, 2021 WL 3475620, at *5 (S.D.N.Y. Aug. 5, 2021), *aff'd sub nom. Marseille*

*v. Mount Sinai Hosp.*, No. 21-2140, 2022 WL 14700981 (2d Cir. Oct. 26, 2022).  For misconduct to be legally "comparable," courts require the comparator's misconduct to be of "comparable seriousness." *Est. of Airday v. City of N.Y.*, No. 22-1081, 2023 WL 4571967, at *1-2 (2d Cir. July 18, 2023); *see also Hamilton v. DeGennaro*, No. 17-7170, 2019 WL 6307200, at *11 (S.D.N.Y. Nov. 25, 2019) (holding comparator must have "engaged in **all of the same misconduct as plaintiff, or at least committed the most serious of the infractions [as plaintiff]**." (emphasis added; citations omitted)).  Courts in the Second Circuit take a narrow view of what constitutes "comparably serious" misconduct.  *See, e.g.*, *Est. of Airday*, 2023 WL 4571967, at *1 (purported comparator misconduct—falsifying and tampering with records – was not "comparabl[y] serious" to plaintiff's misconduct – violating a court order); *Hamilton*, 2019 WL 6307200, at *11 (corporal punishment by other employees that did not result in physical injury was not "comparabl[y] serious[]" to plaintiff's conduct that injured a student's arm).

Plaintiff has not identified any purported comparators who were terminated for the same reasons as Plaintiff, i.e., for violating the Pre-Duty Use Prohibition **and** for lacking candor during the investigation of that violation.  (56.1 ¶ 87.)  To the extent Plaintiff attempts to rely on alleged conduct of other Delta employees who did not violate the Pre-Duty Use Prohibition, Plaintiff's argument fails as a matter of law.  *See, e.g.*, *Est. of Airday*, 2023 WL 4571967, at *1; *Hamilton*, 2019 WL 6307200, at *11.  Delta considers a violation of the Pre-Duty Use Prohibition is considered much more serious than a violation of other parts of Delta's Alcohol Policy.  (56.1 ¶¶ 7-9; Gilmartin Tr. 19:8-14.)  Critically, in the last five years, only one other New York-based flight attendant was found to have violated the Pre-Duty Use Prohibition.  (56.1 ¶¶ 99-100.)  That flight attendant did not identify as Black, was over forty years younger than Plaintiff, and also was terminated.  (*Id.* ¶ 100.)  The only evidence of another employee engaging in comparable

-20-

misconduct—although there is no evidence in the record suggesting that employee also lied to Delta—only supports the conclusion that Plaintiff was treated the same as similarly situated comparators outside of her protected classes; it does not give rise to an inference of discrimination.

### 2. Plaintiff's Subjective Beliefs About What Was Required Under Delta's Alcohol Policy Cannot Raise An Inference of Discrimination.

"[A] plaintiff's mere subjective belief that [s]he was discriminated against will not sustain a claim." *Henry*, 531 F. Supp. 3d at 586.  Plaintiff's assertion that Delta should have tested her for alcohol consumption while she was still in Accra has no evidentiary support.  Plaintiff concedes that Delta does not conduct alcohol testing at the Accra airport.  (56.1 ¶ 43.)  Even if Delta had such capacity, an alcohol test would not refute the observations of Delta's witnesses, who reported that they observed Plaintiff drink between a few sips and half a beer that afternoon, particularly if the test was administered hours after those observations.  (*Id.* ¶ 9.)  Moreover, Delta's witnesses testified that Delta does not mandate that employees be tested for all violations of the Alcohol Policy, specifically including the Pre-Duty Use Prohibition, which requires that flight crewmembers abstain from *any* consumption (i.e., regardless of volume) within eight hours of their report time.  (*Id.* ¶ 9; Gilmartin Tr. 12:13-25.)  It is also undisputed that the instruction not to test for alcohol was given by Delta's Substance Testing team, against whom Plaintiff has not alleged a single allegation (discriminatory or otherwise).  Plaintiff's subjective belief that she should have been tested has no evidentiary weight and cannot give rise to an inference of discrimination.  *See Henry*, 531 F. Supp. 3d at 586; *Smalls*, 396 F. Supp. 2d at 371.  Accordingly, Plaintiff cannot satisfy her prima facie burden and her discrimination claims should be dismissed on that basis alone.

**B.     Delta Had Legitimate, Non-Discriminatory Reasons to Suspend and Terminate Plaintiff's Employment.**

Even if Plaintiff were able to establish her prima facie case (which she cannot), there is a voluminous record of Delta's legitimate, non-discriminatory reasons to suspend and terminate Plaintiff's employment for violating the Pre-Duty Use Prohibition **and** lacking candor with Delta during its investigation of that violation.   Plaintiff's misconduct was extremely seriously, particularly because of the nature of her job.  As a member of an international flight crew working a Trans-Atlantic flight, Plaintiff had been entrusted—by Delta, her colleagues, and Delta's passengers—with the safety of everyone on board the aircraft.  Plaintiff violated that trust.  Further, Plaintiff's lack of candor during the course of the investigation meant that **Delta could not trust Plaintiff to comply with safety policies and regulations in the future.**  Delta's decision to suspend and terminate Plaintiff's employment could not have been more reasonable or legitimate.

The evidence supporting Delta's decision includes:

- Mr. Gilmartin's notes to file of his conversations with Captain Corrao, Ms. Passman, Mr. Ramos, Mr. Ramos, and the Substance Testing Team (Ex. J);

- The written statements of Captain Corrao, Ms. Passman, and Ms. Harps (Ex. H);

- Mr. Gilmartin's notes to file regarding the suspension meeting (Ex. J);

- Mr. Gilmartin's, Mr. Sooknanan's, and Ms. Pardo's written recommendations for termination (Ex. L);

- The bar menu and email exchanges between Mr. Gilmartin, Ms. Pardo, and Mr. Jackson regarding the investigation (Ex. K); and,

- The sworn deposition testimony of Delta's witnesses (Exs. B-E).

The record also supports Delta's conclusion that Plaintiff was not candid with Delta during the investigation.  Indeed, at various times, Plaintiff has claimed: (1) She only took "a few sips" of the beer on her table; (2) she only drank the beer because she intended to call off the flight; (3) the beer was ordered by a male friend named Ebenezer, or an Uber Driver named Mike, or a woman

named Helen Sampson David; (4) the beverage on the table was a non-alcoholic cider, coke, a malt, a malt cider, or a Friels Cider; (5) a waiter mistakenly brought Plaintiff's friend's beer to her when she changed tables after the friend left the hotel; and, (6) [a]fter a fly landed in her friend's left-over beer, a waiter brought a new beer to the table in a glass that looked exactly like the glass Plaintiff's non-alcoholic beverage was in.  (56.1 ¶¶ 38, 53, 55, 61, 64, 76, 78, 89, 95, 97.)  In contrast to these shifting stories, Delta and Delta's witnesses explanations have been wholly consistent.  Accordingly, Delta has more than satisfied its burden to articulate a legitimate, non-discriminatory reason for suspending and terminating Plaintiff's employment.

### C.      Plaintiff Has No Evidence To Establish Pretext.

To satisfy her ultimate burden, it is not enough for Plaintiff to simply challenge the basis for Delta's decision to suspend and terminate her employment; she must present evidence that Delta's stated reasons are false and that the true reason was discrimination.  *See Bjorklund*, 832 F. App'x at 98 **("[T]o 'get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.'"** (emphasis added; citation omitted)); *see also Balogun*, 2023 WL 8446743, at *2.  Importantly, in assessing whether Plaintiff has met her ultimate burden, it is not the Court's role to serve as a super-personnel department assessing the wisdom of Delta's decision.  *See Spires v. MetLife Grp., Inc.*, No. 21-2014, 2023 WL 545350, at *2 (2d Cir. Jan. 27, 2023) ("Absent any other evidence of discrimination, we will not second-guess Defendants' decision about which candidate was better qualified."); *Willford v. United Airlines, Inc.*, No. 21-2483, 2023 WL 309787, at *3 (2d Cir. Jan. 19, 2023) ("[O]ur concern is whether [the plaintiff's] firing was the result of illegal discrimination, not whether it was otherwise fair or appropriate." (citation omitted)); *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) ("While we must ensure that employers do not act in a

discriminatory fashion, we do 'not sit as a super-personnel department that reexamines an entity's business decisions.'" (citation omitted)).

Here, as discussed above, Plaintiff does not have any evidence that her suspension or termination were motivated by any discriminatory animus. (*See* Pt. II.A. *supra.*) The record conclusively establishes that Delta made its determination to suspend and terminate Plaintiff based on the information Delta collected during its investigation. (*See* Pt. II.B *supra.*) The Court's role is not to conduct a *de novo* review of that investigation—i.e., the Court need not decide whether it believes Plaintiff consumed a beer—but to assess whether Plaintiff can present evidence that the reasons given for termination were false and the true reason was discrimination. *See, e.g.*, *Macshane v. City of N.Y.*, No. 05-06021, 2015 WL 1298423, at *18-19 (E.D.N.Y. Mar. 23, 2015), *aff'd sub nom. Herlihy v. City of N.Y.*, 654 F. App'x 40 (2d Cir. 2016) ("[T]he evidence merely suggests that defendants conducted imperfect assessments and were mistaken in their conclusions—*not* that they subjected plaintiffs to adverse employment actions because of any discriminatory animus[.]"). Plaintiff's subjective critiques of Delta's investigation—i.e., that she believes she should have been alcohol tested, that she believes Delta should have weighed the evidence differently—do not establish that Delta's explanations were pretextual or that discrimination was the actual reason for the challenged actions. *See, e.g.*, *Gerzhgorin v. Selfhelp Cmty. Servs., Inc.,* No. 18-04344, 2021 WL 8013836, at *14 (E.D.N.Y. Mar. 2, 2021), *R. & R. adopted*, 2022 WL 912523 (Mar. 29, 2022), *aff'd*, No. 22-808, 2023 WL 2469824, at *3 (2d Cir. Mar. 13, 2023) ("Plaintiff's belief that Defendants' policies and procedures differed from what was expected of him . . . does not establish that Defendants' explanation for his termination was pretextual."). Further, Plaintiff has no evidence to establish that age was the "but-for" cause of her suspension and termination. *See, e.g.*, *Lopez v. N.Y. City Dep't of Educ.*, No. 17-9205, 2020

-24-

WL 4340947, at *9 (S.D.N.Y. July 28, 2020) (fact that other, younger employees purportedly engaged in similar misconduct and were not disciplined could not demonstrate that age was the but-for cause of discipline even at the pleading stage); *Abdelsayed v. NYC Dep't of Educ.*, No. 16-1775, 2019 WL 13271813, at *12 (E.D.N.Y. Mar. 12, 2019) (holding record establishing that employer received complaint of policy violation by plaintiff, investigated, and substantiated the allegations, precluded showing of but-for cause of termination).  There is absolutely no evidence to rebut the voluminous record of Delta's legitimate and non-discriminatory reasons, nor any evidence that discrimination was the true driver of the end of Plaintiff's employment.

## <u>CONCLUSION</u>

For all of the reasons set forth above, Delta respectfully requests that the Court grant summary judgment in its favor and dismiss Plaintiff's claims in their entirety with prejudice.

Dated: March 14, 2024

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**
*/s/ Ira G. Rosenstein*
Ira G. Rosenstein
Michael F. Fleming
101 Park Avenue
New York, NY 10178-0060
ira.rosenstein@morganlewis.com
michael.fleming@morganlewis.com

*Attorneys for Defendant Delta Air Lines, Inc.*