# EXHIBIT E

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
 3   EASTERN DISTRICT OF NEW YORK
 4   Case No. 1:23-cv-2662
 5   ----------------------------------------x
 6   JOAN HARVEY,
 7                    Plaintiff,
 8        - against -
 9   DELTA AIR LINES, INC.,
10                    Defendant.
11   ----------------------------------------x
12
13                 November 27, 2023
                   11:02 a.m.
14
15   Deposition of Defendant, by DAVID
16   GILMARTIN, taken by the Plaintiff,
17   pursuant to Notice, held via Zoom, before
18   Tammy O'Berg, a Shorthand Reporter and
19   Notary Public of the State of New York.
20
21
22
23
24
25
```

Page 12

1           DAVID GILMARTIN
2  the policy for addressing it?
3       A.    They would need to be contacted,
4  and if they are drinking within eight
5  hours, they would be removed from their
6  assignment.
7       Q.    Are they automatically removed?
8       A.    Automatically.
9             We do follow up to see, you
10 know, what witnesses there were or how,
11 you know, it was proven that they were
12 drinking within eight hours.
13      Q.    Isn't it true that the FAA
14 regulations require that they get tested?
15      A.    No.
16            MR. FLEMING:  Object to form.
17      Q.    How do you know that's not
18 required?
19      A.    Because it's the policy.
20      Q.    Which policy?
21      A.    Delta's Alcohol and Drug Misuse
22 Prevention Program.
23      Q.    Can you be more specific?
24      A.    They cannot drink or consume
25 alcohol within eight hours of their shift

Page 19

1            DAVID GILMARTIN
2    suspicion is not enough.  We would conduct
3    an investigation, and if an investigation
4    revealed that they were drinking within
5    eight hours, that would be something that
6    would be -- result in a suspension and
7    termination.
8            If someone's drinking within
9    eight hours or on board the airplane, they
10   are not eligible for anything less than a
11   termination; whereas if you have a
12   positive test for a first time, you could
13   potentially have conditional
14   reinstatement.
15       Q.   So what would you -- so you're
16   saying if someone is suspected of alcohol
17   consumption and you determine based on
18   their statements and other witnesses'
19   statements that they have consumed
20   alcohol, they are automatically
21   terminated?
22           MR. FLEMING:  Objection.  It's
23       not what he testified to.
24       A.   If I could have that question
25   repeated, please.

Page 24

1  DAVID GILMARTIN - CONFIDENTIAL
2              MS. SELIGER:  I think that's the
3      end of confidential portion.
4              (End of confidential portion of
5      the transcript.)
6      Q.     Do you know why Joan Harvey was
7  fired?
8      A.     She consumed alcohol within
9  eight hours of her departure out of Accra.
10     Q.     When were you first informed
11 that someone had accused Joan Harvey of
12 consuming alcohol within eight hours of
13 her shift?
14     A.     It was the same day that it
15 happened.  Received a call from a crew
16 member in Accra with a concern.
17     Q.     Do you remember who that was?
18     A.     I recall it being a Flight
19 Attendant Judith Passman, as well as a
20 Captain Pete Corrao.
21     Q.     Did they contact you together?
22     A.     First Judith reached out and
23 then Peter joined later.
24     Q.     What did Judith tell you?
25     A.     She was concerned that a flight

Page 25

```
 1           DAVID GILMARTIN
 2  attendant on her crew, her service leader,
 3  was drinking alcohol within eight hours of
 4  pickup by the pool.
 5       Q.   Did she tell you anything else?
 6       A.   She just mentioned that she was
 7  aware the captain was out there, as well
 8  as another flight attendant.
 9       Q.   And anything else?
10       A.   That's all I recall.
11       Q.   What did the captain tell you?
12       A.   That he spoke with Miss Joan
13  Harvey, and that she told him she only had
14  a couple of sips of the beer.
15       Q.   Anything else?
16       A.   That's the most significant part
17  that I remember.
18       Q.   Was Miss Passman an eyewitness
19  to Joan drinking an alcoholic beverage?
20       A.   No.
21       Q.   Did you ask her if she did
22  anything to figure out if the captain's
23  allegations were true?
24       A.   No, and that wouldn't be her
25  job.
```

Page 35

1            DAVID GILMARTIN
2    consuming alcohol or beer within eight
3    hours of pickup, and that she told the
4    captain that she'd had a few sips.
5        Q.    Did you tell him anything else?
6        A.    Not that I recall.
7        Q.    And then did you call Joan
8    Harvey next?
9        A.    Yes.
10       Q.    And was Mr. Ramos on the phone?
11       A.    Yes.
12       Q.    Did Miss Harvey know that
13   Mr. Ramos was on the phone?
14       A.    Yes.
15       Q.    Actually, I just would like to
16   back up for a minute.
17             What is Mr. Ramos's title?
18       A.    He's an OCC manager, Operational
19   Control Center, OCC manager.
20       Q.    And what his role?
21       A.    The OCC managers staff a hotline
22   where flight attendants around the world
23   can call about any operational issues, if
24   they're sick or, you know, whatever
25   situation has happened, if there's any

```
 1              DAVID GILMARTIN
 2   incidents, the OCC managers field that,
 3   and let the base leadership know.
 4       Q.   And does he make any decisions
 5   about the flight attendants?
 6       A.   They'll partner with the base on
 7   making decisions.
 8       Q.   And did he -- did he tell you
 9   anything in that conversation?
10       A.   No.
11       Q.   Did you try to verify the
12   allegations with Joan before contacting
13   him?
14       A.   No.  We need to speak to her.
15       Q.   Sorry, I didn't hear that.
16       A.   Can you repeat the question?
17       Q.   Did you try to verify the
18   allegations with Joan before calling
19   Mr. Ramos?
20       A.   No.  We called together.
21       Q.   So what was discussed with Joan
22   when you and Mr. Ramos called her?
23       A.   The concerns of what we saw at
24   the pool -- or what was seen at the pool,
25   the witnesses and the concerns that were
```

Page 51

```
 1              DAVID GILMARTIN
 2      A.      Sure.
 3              Yes, I'm ready.
 4      Q.      Do you know what this document
 5   is?
 6      A.      This is her statement, Joan
 7   Harvey's.
 8      Q.      Have you seen this before?
 9      A.      Yes.
10      Q.      When did you see this document?
11      A.      The day it was written.
12      Q.      When was it written?
13      A.      October 22nd, 2021.
14      Q.      It looks like that's when it was
15   sent from Shannon Kelly to you; is that
16   correct?
17      A.      Yes.  She also wrote on the
18   bottom of it that day, as well.
19      Q.      Right.  What's the first
20   sentence of what she wrote in her own
21   handwriting at the bottom?
22      A.      I can was not drinking.  I was
23   not very service.  I was falsely accused
24   of that -- I had -- I had the drink the
25   night before.
```

Page 57

```
 1              DAVID GILMARTIN
 2      A.    No.
 3      Q.    So how do you know that's not a
 4  nonalcoholic beer or cider?
 5            MR. FLEMING:  Object to form.
 6      A.    I don't, but she never admitted
 7  to saying that when she was with the
 8  captain; and she even asked what time she
 9  had to stop drinking.
10      Q.    Did she tell you that she asked
11  that question?
12      A.    No.
13      Q.    Who told you that?
14      A.    Captain Pete Corrao.
15      Q.    So do you know what Malta is?
16      A.    No.
17      Q.    That's -- if I told you that was
18  also a beverage on the menu, how would you
19  know that that's not a nonalcoholic beer
20  or cider?
21            MR. FLEMING:  Object to form.
22      A.    Because I spoke to the hotel
23  staff and asked them directly.
24      Q.    When did you speak to the hotel
25  staff?
```

```
                                            Page 68
 1            DAVID GILMARTIN
 2      Q.    I'm going to ask you to review
 3   this one, as well, and just tell me to
 4   scroll down when you get to the bottom.
 5      A.    Yes.
 6            You can go down.
 7            Yes, I'm ready.  I'm ready.
 8      Q.    That's the end.
 9            Have you seen this document
10   before?
11      A.    Yes.
12      Q.    Can you tell me what this is?
13      A.    This was a recap of the
14   suspension meeting.
15      Q.    And who was in that meeting?
16      A.    Myself and FMS Shannon Kelly.
17      Q.    And were you present in person?
18      A.    I was present by phone,
19   virtually.
20      Q.    And Miss Kelly was in the room
21   with Joan?
22      A.    Yes.
23      Q.    Isn't it true that in the
24   suspension meeting Joan again denied
25   drinking beer on that day?
```

```
                                                   Page 79
 1              DAVID GILMARTIN
 2    she got to Atlanta?
 3        A.    I did.  I left her a message.
 4              MS. SELIGER:  I'm going to stop
 5        the share.
 6              (Discussion off the record.)
 7              (Brief recess taken.)
 8    BY MS. SELIGER:
 9        Q.    Mr. Gilmartin, after the
10    suspension meeting with Miss Harvey, did
11    you conduct any sort of investigation into
12    the truth of whether or not she had been
13    drinking?
14        A.    That was all part of the
15    investigation.
16        Q.    Did you review any documents
17    other than the statements from Mr. Corrao,
18    Miss Harps, Miss Passman, and Joan Harvey?
19        A.    Those were all the parties that
20    were involved.
21        Q.    And did you review any other
22    documents other than their statements?
23        A.    Besides their statements, just
24    the menu from the hotel.
25        Q.    Do you recall reviewing a letter
```

```
                                                   Page 87
 1              DAVID GILMARTIN
 2      A.      Yes.
 3      Q.      When did you make that call to
 4   the hotel?
 5      A.      She asked me to do it -- or she
 6   prompted me or asked a question on
 7   November 17th, and I replied back on
 8   November 17th, so within that timeframe.
 9      Q.      Was that the first time you had
10   called the hotel?
11      A.      I believe so.
12      Q.      Do you see where it says that,
13   in same e-mail, they do not serve
14   nonalcoholic cider, only cider with
15   alcohol?
16      A.      Yes.
17      Q.      Who gave you that information?
18      A.      The bartender at the hotel.
19      Q.      Do you know what his name was or
20   her name?
21      A.      No.
22      Q.      Did you document that
23   conversation anywhere?
24      A.      Just right here.
25      Q.      And the person you spoke to, was
```

Page 93

DAVID GILMARTIN

A. I made the recommendation, and our legal team, our HR team and our Equal Opportunity team supported the decision.

Q. And on what basis did you make the decision to recommend termination?

A. Witness accounts of her consuming alcohol within eight hours of departure, of report time.

Q. And when did you make that decision?

A. The decision to suspend her?

Q. The decision to terminate or recommend termination.

A. The day that we met with her.

Q. So you had already determined at the time of her suspension that you were going to recommend her termination?

A. We had secured her statement, and then we send in the documentation. But, yes, we suspended her with the plan to review all documents for termination.

Q. And is that when you made the decision to recommend her for termination?

A. Yes.

```
                                              Page 98
 1              DAVID GILMARTIN
 2   BY MS. SELIGER:
 3       Q.    Without revealing any contents
 4   of any privileged conversations, did you
 5   speak with your attorney during the break?
 6       A.    I did not.
 7       Q.    Sorry, I can't hear you.
 8       A.    No.
 9       Q.    Before the break we were talking
10   about the termination meeting with Miss
11   Harvey.
12             So you said that you
13   participated in this meeting via
14   telephone; is that correct?
15       A.    I did, but I'm not remembering
16   this meeting.
17       Q.    So are you sure that you were
18   participating in the termination meeting?
19       A.    I'm not sure.  Because I
20   remember getting the notice that it came
21   through, but I don't remember -- I know a
22   corporate director had to be in it or
23   Andrea Misserian because of her 20-plus
24   years.
25       Q.    Whose 20-plus years?
```